351 So.2d 336 (1977)
OCCIDENTAL CHEMICAL COMPANY, Petitioner,
v.
William T. MAYO, William H. Bevis, and Paula Hawkins, As and Constituting the Florida Public Service Commission, Respondents.
No. 47928.
Supreme Court of Florida.
July 14, 1977.
Rehearing Denied November 21, 1977.
*338 Robert R. Feagin, III and George L. Varnadoe, of Holland & Knight, Tampa, for petitioner.
William L. Weeks, Prentice P. Pruitt and Donald R. Alexander, Tallahassee, for the Florida Public Service Commission, respondents.
S.A. Brandimore, R.W. Neiser, H.A. Evertz, III and J.A. McGee, St. Petersburg, and B. Kenneth Gatlin and John W. Costigan, of Madigan, Parker, Gatlin, Truett & Swedmark, Tallahassee, for Florida Power Corp., intervenor-respondent.
Woodie A. Liles, Donald W. Weidner and C. Earl Henderson, Tallahassee, for the Citizens of the State of Florida, intervenors.
ENGLAND, Justice.
Occidental Chemical Company purchases electric power from Florida Power Corporation. When Florida Power sought a general rate increase from the Public Service Commission early in 1974, Occidental intervened in the rate proceeding. Eventually, the Commission granted Florida Power a rate increase of approximately $45,000,000, and Occidental now asks us to review that portion of the Commission's award order which allocates the rate increase among Florida Power's classes of customers.[1] Occidental asks, alternatively, that we invalidate the Commission's entire decision because it was made in violation of Florida's so-called "Sunshine Law", Section 286.011, Florida Statutes (1975). In this Occidental is joined by public counsel for the citizens of Florida.
*339 Occidental's major concern as to its share of the new rates is that the Commission rejected a predominant "cost of service" basis for allocating the company's new rates among customers, and chose instead to allocate the additional revenues among Florida Power's customers mainly by a proportional increase of rates previously paid by Florida Power's several classes of customers.
A limited review of the development of this controversy will place it in perspective. The Commission held several days of public hearings on the proposed rate increase, in which Occidental actively participated. During these hearings the Commission received considerable evidence regarding the amount of Florida Power's proposed rate increase, and the fairness of its rate structure. Occidental attempted to convince the Commission to use a "cost of service" method for allocating any rate increase among customers, believing its consumption costs Florida Power less to generate and distribute than other customer classes, such as residential. There was general agreement among the witnesses who appeared before the Commission as to the fairness of a "cost of service" rate structure but there was little agreement as to how to determine the costs of serving various users.[2]
At the close of all testimony, some of the hearing participants, including intervenors, requested that they be provided copies of the Commission staff's recommendations prior to the submission of their briefs. The requests were denied. Counsel for the Commission stated, however, that copies of the staff's recommendations would be provided to the parties at the same time they were received by the Commission, or two or three days earlier, if possible.
On July 21, 1975, the Commission held a scheduled, public "agenda conference" at which it considered Florida Power's rate request, and on that date the commissioners and all parties were given a copy of the staff's 22 1/2 page proposed partial order. (The recommendations of the rate department staff had been filed with the clerk of the Commission three days earlier, on a Friday. These included a recommendation that the increase in rates be spread proportionally among the company's classes of customers.) The proposed partial order approved the rate design of the company during the period that an interim rate increase had been in effect, but it made no recommendation for permanent rate design other than rejecting Occidental's position on "cost of service".
Florida Power's portion of the agenda conference lasted for approximately 90 minutes. During that time the only mention of rate design came as staff counsel concluded an oral recitation of recommendations:
"Finally, the overall increase 19.9 percent. This compares with about 15 and a half to 15.9 per cent granted on an interim basis. These increases we are recommending be spread in a proportional manner to that proposed by the company originally." (emphasis supplied)
The Commission made no inquiry and there was no other discussion on this recommendation, which, of course, implicitly rejected Occidental's major concern throughout the entire proceeding. After the discussion the commissioners recorded on a vote sheet their individual votes on the staff's overall recommendation and some minor evidentiary matters.
The following day Order No. 6794 was issued, consisting of 27 1/2 pages and containing the staff's 22 1/2 page proposal essentially verbatim.[3] Discussion in the extra five pages was confined to "General Tariff Design" and "Distribution of Revenues", the *340 latter section expressly rejecting intervenors' attempt to use cost of service as the sole or dominant criterion for allocating rates. The balance of these pages contained the Commission's confirmation of facts discussed in the first 22 1/2 pages, a set of formal "findings of fact" essentially repeating matters set out in the first 22 1/2 pages, directive orders and two partial dissents not relevant here. Among the formal findings were statements
"12. That there is no legal requirement that rates for different classes of service must be either uniform or equal or that they generate an equal amount of return.
13. That in designing rates many factors must be considered, including but not limited to such factors as history of the tariff, rate continuity, public acceptance, value of service, cost of service, conservation, competition, and consumption and load characteristics, and that no single factor is controlling and susceptible of precise quantification but rather each must be viewed collectively in designing said rates."
Occidental contends that the Commission's decision regarding cost of service is neither supported by adequate findings of fact nor competent and substantial evidence. The Commission, joined by Florida Power, contests this assertion and further argues that cost of service need not be the sole or dominant factor in structuring rates anyhow.[4]
Three interrelated issues presented for our review are the choice of allocation criterion, the sufficiency of the evidence, and the adequacy of the Commission's findings. Treating the first, we note that no statute mandates a pure "cost of service" rate structure. In the past, we have recognized that other criteria may be used by the Commission in setting fair and reasonable rates. State v. Bevis, 283 So.2d 348 (Fla. 1973) (value of service). See also Market Street Railway v. Railroad Commission of California, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). In Idaho Power Co. v. Thompson, 19 F.2d 547, 579-80 (S.D.Idaho 1927), the complexity of the problem and the need for a deference to agency expertise were described as follows:
"Rate schedules involve a complexity of considerations. As a whole, they must yield a reasonable return on the investment. A relatively low rate may yield a larger aggregate net return than one that is relatively high. Rates need not be uniform, but, with rare exceptions, each should be above the cost of the particular service. A particular rate may be reasonable from the standpoint merely of cost (including investment); but, if it is prohibitive, because in excess of what the consumer can afford to pay  that is, in excess of its value to the consumer  it may be unreasonable. If it is the duty of the commission to see to it that the rates, both as a whole and for each particular service, are just to the utility and reasonable for the consumer, and nondiscriminatory as between consumers, it must have the power, not only to fix the rates for each class, but to classify."
It may be, as Occidental contends, that "cost of service" is an ideally fair basis for structuring utility rates between various classes of users. Actually, we do not read Order No. 6794 as deciding otherwise. The Commission simply found on this record that there was no present means to implement a pure "cost of service" rate structure. Given the multiplicity of methods suggested by the experts to allocate expenses between various users, we cannot say that the Commission departed from the essential requirements of law in relying on a range of criteria for this purpose. It is immaterial whether we would agree or disagree with Occidental as to the weight to be given a particular "cost of service" formula. The Commission sets rates; not this Court. Florida Retail Federation, Inc. v. Mayo, 331 So.2d 308 (Fla. 1976).
An entirely separate issue is whether the Commission's rate structure selection *341 is supported by competent, substantial evidence. An examination of the relevant portions of Order No. 6794 discloses that, except for a few unexplained re-classifications of customers, the Commission retained the basic rate structure previously approved for Florida Power as being fair and reasonable. It is difficult for us to overturn a decision of the Commission to continue a rate structure previously found to be fair and reasonable, absent a clear showing in the record that the earlier structure was arbitrary or that changed circumstances have made it unreasonable. In this case, Florida Power fully explained why its proposal for new rates was based generally on its previous rate design, and why it proposed to make some modifications. The record contains adequate evidence to support the Commission's decision.
The third issue is whether the order contains a sufficient supporting statement of facts. All parties agree that the Commission must include in its orders the specific findings of fact upon which its ultimate conclusion is founded.[5] While the order does not identify specific facts in the record supportive of the several "findings" made by the Commission,[6] we find no error sufficient to justify a remand for more specificity. The Commission dealt very specifically with all significant rate design changes. Obviously, the Commission was not required to include in its order a summary of the testimony it heard or a recitation of every evidentiary fact on which it ruled. The order contains a succinct and sufficient statement of the ultimate facts upon which the Commission relied, including commentary expressly directed to Occidental's contentions.
Finally, we are asked to hold that the Commission violated the Sunshine Law in reaching its decision in this case.[7] Section 286.011(1), Florida Statutes (1975), requires public meetings whenever the Commission takes "official acts", and it invalidates "formal action" taken in private. Initially, we reject Occidental's broad-brush argument that all meetings between the commissioners and their staff must be open to the public. The Commission's staff is not subject to the law.[8]
Occidental argues, more narrowly, that because the agenda conference lasted only 90 minutes and resulted in adoption of the pre-prepared staff proposal, the commissioners either met in private to reach a consensus or delegated their decision-making responsibility to staff. Admittedly, the adoption of a multi-page decision document at the end of a complex rate case, with minimal pertinent discussion, creates an appearance of pre-judgment. There is, of course, no evidence in this record that the commissioners met in secret or used staff members as intermediaries in order to circumvent public meeting requirements.[9] *342 The Commission suggests that it is just as reasonable on this record to assume, contrary to Occidental's assumptions, that the commissioners individually studied Florida Power's petition in light of the extensive data they personally heard developed at the hearings, that they reached independent judgments on the many issues involved in rate-making, and that in doing so they would have been privileged to call upon staff members for legal advice or for an amplification of facts.
We cannot indulge in speculation as to what did or did not occur with respect to matters contained in the 22 1/2 page partial order prepared prior to the agenda conference. So far as the record shows, the commissioners did not discuss various points among themselves before making a final decision. They may have utilized some preconceived standard procedure to reduce all issues to writing, in the form of a draft order, in preparation for their joint meeting at the agenda conference. There is no infirmity in their process if they did. Nothing in the Sunshine Law requires each commissioner to do his or her thinking and studying in public.[10] The law is satisfied if the commissioners reached a mutual decision on rate matters when they met together in public for their "formal action". They were unquestionably free to alter their views on some or all of their staff's 22 1/2 pages of recommendations until their votes were recorded at the end of their public meeting.
The "agenda conference" procedure by which the Commission decided those portions of the rate case contained in the 22 1/2 page staff proposal may not produce the robust and open public debate which advocates of open government would like, but there has been no showing that an official act of the Commission preceded the public meeting or that the commissioners met together to reach a final decision out of the public spotlight. The mere inference offered by Occidental is no more persuasive than that offered by the Commission. This case, then, is not controlled by Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla. 1974), where the record adequately established that the town council had created a citizens committee to serve as its alter ego, and that the council later gave summary approval to the committee's recommendations in a purely ceremonial public meeting.[11]
We note, however, although it has not been argued by the parties, that the Commission did not specifically approve in any public meeting the last five pages of Order No. 6794. In those pages the Commission for the first time expressly approved as fair and reasonable Florida Power's proposed distribution of the rate increase among customers, and set the precise percentages by which the rates for each class of customers would be raised. It is unclear whether these findings were made *343 in public. The ambiguous nature of the Commission's voting procedure makes it impossible for us to determine whether the commissioners were approving not only the proposed partial order of their staff but also the previously-filed recommendations of the rate department. Absent a clear record and a proper presentation of the issue by the parties, we can make no decision on these findings in Order No. 6794.
For these reasons, the petition for the writ of certiorari is denied.
OVERTON, C.J., and SUNDBERG and HATCHETT, JJ., concur.
ADKINS, J., dissents with an opinion.
BOYD, J., dissents.
ADKINS, Justice, dissenting.
I dissent from that portion of the decision relating to Section 286.011, Florida Statutes.
This statute in pertinent part provides as follows:
"(1) All meetings of any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation or any political subdivision, except as otherwise provided in the constitution, at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule, regulation or formal action shall be considered binding except as taken or made at such meeting."
In Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla. 1974), this Court held that a citizens' planning committee composed of private citizens, established by the Town Council, which appointed the members, was subject to the government in the sunshine law. The purpose of the committee was to guide a planning firm whose services had been contracted for by the Council in the firm's production of an updated zoning plan for the town. Numerous meetings between the committee and the planners took place, none of which were open to the public. Upon presentation of the plan to the Council, full public meetings and hearings were conducted and proper procedure followed. The comprehensive zoning plan was approved in essentially the same form as that which had been produced by the planners and the committee.
This Court found the committee to be an arm of the Town Council, and declared that a subordinate group or committee selected by governmental authorities should not feel free to meet in private. The rationale was stated as follows:
"One purpose of the government in the sunshine law was to prevent at non-public meetings the crystallization of secret decisions to a point just short of ceremonial acceptance. Rarely could there be any purpose to a non-public pre-meeting conference except to conduct some part of the decisional process behind closed doors. The statute should be construed so as to frustrate all evasive devices. This can be accomplished only by embracing the collective inquiry and discussion stages within the terms of the statute, as long as such inquiry and discussion is conducted by any committee or other authority appointed and established by a governmental agency, and relates to any matter on which foreseeable action will be taken." (p. 477)
Characterization of an agency's decisionmaking process as "quasi-judicial" does not authorize the agency to make decisions out of the sunshine. Canney v. Board of Public Instruction, 278 So.2d 260 (Fla. 1973). The Public Service Commission clearly falls within the term "any agency" as used in the statute, and is therefore subject to the requirements of the Government in the Sunshine Law. Attorney General Opinion 073-344 (1973).
An examination of the circumstances surrounding the instant case compels the conclusion that the influence and input of the Commission staff in the decisionmaking process was so considerable as to subject the staff itself to the requirements of the Government in the Sunshine Law. The staff prepared a proposed order which was first made public at the Commission's *344 Agenda Conference of July 21, 1975. Discussion of the proposal lasted ninety minutes, after which time the Commission, by a 2-1 vote, issued Order No. 6794 in essentially the same form as proposed by the staff.
The Commission and Intervenor Florida Power Corporation contend that there is nothing in the record to indicate that the Commission blindly adopted the staff's recommendations without exercising its own final discretion. In support of this contention, respondents note that the Commissioners sat through four weeks of evidentiary hearings, thereby acquiring considerable knowledge of various phases of rate-making and revenue requirements. Nevertheless, I find that the Commission's decision was crystallized upon completion of the proposed order by the staff, shielded from the "sunshine" to which the law required it to be exposed. Section 286.011, Florida Statutes.
The purpose of the government in the sunshine law is not to open every performance of an administrative duty by an agency employee to public scrutiny. Such an interpretation would hinder governmental function to the point of deleteriously affecting the citizenry whom the law was designed to protect. Where official agency action is to be taken, however, the will of the people as expressed through the legislature is that the deliberations which result in the consummation of such action will be held in full public view.
The Order entered by the Commission following the Agenda Conference was twenty-eight pages long. It is inconceivable that an interested party could have comprehended the full nature and scope of the Order based upon the ninety minutes of discussion devoted to the proposal at the conference. It is also unlikely that the Commission, notwithstanding its expertise in the area acquired at the evidentiary hearings, could have arrived at a final decision on these highly complex matters after such brief consideration. Thus, the decision must have been reached at an earlier point in time. The fact that no specific meeting date of the Commission and/or its staff appears in the record does not preclude this Court's finding a lack of compliance with the government in the sunshine law. It is sufficient that the surrounding circumstances clearly indicate that action tantamount to finalization was taken out of the sunshine. Requiring evidence of a particular meeting at a specific time and place would serve only to encourage concealment and secrecy in governmental proceedings, thereby undermining the statutory purpose.
Merely showing that the government in the sunshine law has been violated constitutes an irreparable public injury. Town of Palm Beach v. Gradison, supra, at 477; Times Publishing Co. v. Williams, 222 So.2d 470 (Fla. 2d DCA 1969).
Accordingly, Order No. 6794 of the Commission should be declared void for failure to comply with Section 286.011, Florida Statutes, and this case should be remanded to the Commission for further proceedings.
NOTES
[1] We have jurisdiction by reason of Art. V, § 3(b)(3), Fla. Const., and § 366.10, Fla. Stat. (1975).
[2] Allocation of overhead and the cost of multiple use facilities, such as transmission lines, was particularly difficult. Additional difficulties resulted from allocating a fair rate of return to each class. Public counsel has pointed out to us an exhibit placed in evidence by Stauffer Chemical Company, an intervenor before the Commission, which shows that the use of any of four different methods of allocating costs produces four different rates of return on Florida Power's service to the phosphate mining class. These rates of return range from a low of less than 6% to a high of nearly 19%.
[3] Minor language changes appeared in two places.
[4] Florida Power observes that Occidental did not prepare a "cost of service" study for submission to the Commission, and that Occidental vigorously attacked a cost study which Florida Power had prepared before drafting its rate increase request.
[5] § 366.041(4), Fla. Stat. (1975); Greyhound Lines, Inc. v. Mayo, 207 So.2d 1 (Fla. 1968). This case antedates the state's new administrative procedure act, however. See § 120.59(2), Fla. Stat. (1975).
[6] The Commission said it considered "value of service", "competition" and "conservation" as factors relevant to rate design. As there was no evidence or controversy concerning these matters, it is not apparent how the Commission could have developed underlying facts in the hearings. It is clear, however, that the Commission did not implement a major change in rate design as a result of considering those factors. Were we to disregard these findings, the Commission's order would still be supported by adequate findings.
[7] The fact that the Commission's decision-making process has been characterized as quasi-judicial does not exempt it from the statute. See Canney v. Board of Pub. Instr., 278 So.2d 260 (Fla. 1973).
[8] § 286.011(1), Fla. Stat. (1975). See Bennett v. Warden, 333 So.2d 97 (Fla. 2d DCA 1976).
[9] After briefing, Occidental moved under Fla. App. Rule 3.6(l) for an order requiring the Commission to supplement the record with minutes, notes or summaries of all communications between staff and the commissioners during the pendency of the rate proceeding. We denied the motion. The rule is not a vehicle for counsel to cure record omissions fatal to the points urged on appeal, or to broaden the scope of review to matters not considered by the lower tribunal. Under the administrative procedure act as currently in effect, the "record" for appellate review of a proceeding such as this one would not include communications to the commissioners from advisory staff, if public records, such as those made before or during an agenda conference. §§ 120.68(5)(a), 120.57(1)(b)(5)(g), Fla. Stat. (Supp. 1976). Presumably these communications can be offset or challenged by the parties at the administrative level, by appropriate motion or petition, either during or after the proceedings. See also Pasco County School Bd. v. Public Employees Relations Comm'n, 336 So.2d 483 (Fla. 1st DCA 1976).
[10] The members of a collegial administrative body are not obliged to avoid their staff during the evaluation and consideration stages of their deliberations. Were this so, the value of staff expertise would be lost and the intelligent use of employees would be crippled. This case does not present a proper occasion, however, for us to determine whether all private collegial discussions among commissioners become decision-making acts which must occur in public. See Times Publishing Co. v. Williams, 222 So.2d 470 (Fla. 2d DCA 1969), suggesting that all deliberative discussions among commissioners are within the act, and contrast Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla. 1974), condemning pre-meeting agreements which have the effect of rendering later meetings a "ceremonial sham".
[11] The Court's ability to review this issue in a certiorari proceeding, unlike its ability to review issues in a criminal proceeding under § 286.011(3) or a declaratory judgment action, is limited. See Dade County v. Marca, S.A., 326 So.2d 183 (Fla. 1976), where we reaffirmed the principle in certiorari proceedings that a reviewing court may not consider matters not made a part of the record in the agency whose order is under review.