425 So.2d 582 (1982)
Robert Q. MARSTON, President, University of Florida, and Fletcher Baldwin, Chairman, Dean Search and Screen Committee, College of Law, University of Florida, Appellants,
v.
Terri WOOD, As Editor of the Verdict, Thomas R. Julin, and Campus Communications, Inc., Appellees.
Nos. AF-475, AJ-393.
District Court of Appeal of Florida, First District.
December 22, 1982.
Rehearing Denied January 31, 1983.
Chesterfield Smith, Julian Clarkson, Michael Fogarty and Gregg Thomas of Holland & Knight, Tampa, for appellants.
Joseph W. Little and Winston P. Nagan, Professors of Law, University of Florida College of Law, Gainesville, amici curiae, for appellants.
Thomas R. Julin of Steel, Hector & Davis, Miami, Sandra Bieber of Sherman & Bieber, and Larry G. Turner of Larry G. Turner & Associates, Gainesville, for appellees.
Jim Smith, Atty. Gen., State of Florida, Tallahassee, and Palm Beach Newspapers, Inc., et al., and Florence Beth Snyder, Gen. Counsel for Palm Beach Newspapers, Inc., West Palm Beach, amici curiae, for appellees.
OWEN, WILLIAM C., Jr., (retired) Associate Judge.
The issue here is whether the Government in the Sunshine Law Section 286.011, Florida Statutes (1980), applies to the Dean Search and Screen Committee of the University of Florida College of Law. We hold that it does not, and reverse the very articulate and cogent order of the trial court to the contrary, together with a separate order awarding attorney's fees, the appeals having been consolidated.
A university's statutory authority to appoint, remove or re-assign academic deans is carried out by the president of the university. Section 240.202, Florida Statutes (1981). The constitution of the University of Florida, Article IV, Section 2(A)(3) requires that the president, in making his appointment of college deans, shall "give consideration to the opinion of the faculty of the college concerned by consultation with a special committee of at least three faculty members elected by the faculty of *583 the college." Search and screen committees are used at the University of Florida to select every college dean, and President Robert Q. Marston never has selected a dean who was not an applicant recommended by a search committee. Thus, when in January 1980 Joseph R. Julin, Dean of the College of Law of the University of Florida, announced that he would resign as Dean effective March 1980, the faculty of the College of Law was notified to elect a committee to carry out the search and screen activities directed toward the selection and appointment of a new dean. The faculty of the College of Law elected seven of its members to serve as the voting members of this committee with Professor Fletcher N. Baldwin as the chairman. The faculty also appointed two students of the College of Law to serve as non-voting members of the committee and President Marston, at the request of the trustees of the Law Center Association, appointed Chesterfield Smith, Esq., a distinguished member of the Bar, to serve on the committee as a voting member.
The precise role and functioning of the decanal search and screen committee has an important bearing on our decision in this case. As its name would imply, the committee did, indeed, search and screen decanal applicants, fulfilling its instructions to "submit a small list of names to the president for his consideration ... representative of the very best talent in legal education in the United States of America." Immediately after it was formed in January 1980, the committee commenced holding regular meetings, usually once a week, kept minutes of its meetings, and established formal rules of precedure together with the criteria which it was to use to screen applicants. The committee was instructed by a vice-president of the University to close to the press and the public those portions of its meetings in which there was discussion pertaining to the qualifications of individual prospective candidates as well as discussions of evaluation of the candidates, such discussions to be carried out in executive session. The committee mailed at least one hundred letters soliciting decanal applicants and by March 1980 approximately forty applications had been received. However, before the committee actually considered any of these in executive session, this suit had been filed and a temporary injunction entered requiring the committee to conduct its meetings in compliance with the Sunshine Law.
The applications which the committee received were divided into primary and non-primary classifications, those in the latter category receiving no further consideration. After debating and evaluating the qualifications of each primary applicant, the committee, on behalf of the faculty, invited six candidates to visit the campus. The committee made no recommendation to the faculty with respect to the candidates, but presented merely the names and credentials to the faculty. During June, July and August 1980, the faculty and others interviewed the six applicants who visited the campus. The faculty declined to recommend any of the six candidates to the president and requested that the search and screen committee resume its search. The committee conducted a second nationwide search following a procedure similar to that followed in the first search. Subsequently, the faculty, not the committee, voted to require sixty percent faculty approval before again inviting an applicant to visit the campus, and further voted to reduce its two-thirds vote of approval to a sixty percent vote before recommending an applicant to the president. In January 1981, the committee recommended to the faculty (not the president) that five applicants be invited for interviews on the campus. At this point the committee ceased its operations. Two of the candidates recommended for invitations withdrew their applications before visiting the campus. The faculty, by its own action and without committee initiative, invited an additional applicant (who had been rejected by the committee) to visit the campus. All candidates were interviewed by the faculty and others including vice-presidents and deans of several colleges. After the on-campus interviews, the faculty recommended to the president all *584 four candidates as being excellent. Before making the selection of a new dean, the president received evaluations of the candidates from the faculty, and from at least three vice-presidents and five deans. The president also consulted with representatives of the legal profession and national educational leaders.
The Sunshine Act, Section 286.011(1), Florida Statutes (1980), in pertinent part provides:
All meetings of any board or commission of any state agency or authority ... at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule or formal action shall be considered binding except as taken or made at such meeting.
Appellants' initial argument is that neither the University of Florida nor its president, is an agency for Sunshine Act purposes. While a compelling argument is made to the effect that if the Legislature had intended to include universities within the scope of the Sunshine Act, it could have included the terms "university," "educational unit," "educational institution," "state university system" or "institution of higher education" and made its intention explicit as was done by the Legislature of the State of Washington, see Cathcart v. Andersen, 85 Wash.2d 102, 530 P.2d 313 (1975), we think it unnecessary to reach that question. Assuming the University of Florida and/or its president is an agency for Sunshine Act purposes, we are persuaded as to the soundness of appellants' second point  neither the search and screen committee nor the College of Law faculty is a "board" or "commission" for Sunshine Act purposes.
We base our decision in this respect upon both the "staff exception" approved by the Supreme Court in Occidental Chemical Co. v. Mayo, 351 So.2d 336 (Fla. 1977) and Bennett v. Warden, 333 So.2d 97 (Fla.2d DCA 1976), and the remoteness of the committee's part in the decision-making process as recognized in Bennett v. Warden, supra, either of which standing alone would, under the facts of this case, be sufficient to sustain our position.
Granted, the committee did play a part in the decision-making process. While its role was partly clerical or administrative in soliciting applicants, and partly fact finding in nature in receiving the applications and compiling the data therein, it cannot be denied that its role also included participation in the selective process. However, its participation in that respect was merely a winnowing process by which it removed from the full faculty the burden of having to evaluate those applicants who clearly were either not qualified or less than fully qualified. The faculty members of the committee, by their academic experience and knowledge, possessed a degree of expertise which was uniquely suited to that winnowing process. Such is a proper function of staff, whose individual and collective expertise is commonly relied upon by public boards and commissions when the decision-making process involves considerations of complex or technical matters as to which the decision-maker has no special training or experience, but which are peculiarly within the expertise of the staff.[1] Indeed, the rules and regulations of the University of Florida mandate that faculty members participate on university and college committees. The decanal search and screen committee,[2] in utilizing the collective expertise of the several faculty members of the committee in evaluating the data contained in the applications for position of dean, seems to have performed a function quite comparable to the function performed by the staff of the Public Service Commission *585 in sifting and evaluating data going into rate-making decisions,[3] or the function performed by the staff of the Department of Health and Rehabilitative Services in screening and evaluating bids and submitting appropriate recommendations to that agency.[4]
Totally apart from our analogizing the function of the faculty committee to that of staff, we conclude that the committee's part in the decision-making process was much too remote from the ultimate decision maker to be considered as formulating policy or crystalizing any part of the decision-making process. While the committee did, indeed, have an indirect input into the decision-making process in the sense of eliminating from further consideration the bulk of the applicants, it must be recognized that in the final analysis the committee's function was solely advisory in nature, and not to the ultimate decision-maker but to the faculty as a committee of the whole. Clearly illustrating the remoteness of the committee's input into the decision-making process were the following facts: after the initial search and screen procedure, the committee, on behalf of the faculty, invited six candidates to visit the campus, none of whom after being interviewed by the faculty and others, received faculty recommendation; subsequently, the committee again recommended to the faculty (not the president) the names of certain applicants to be invited for interviews on the campus, following which the committee ceased its operations; it was the faculty, without committee intervention, that interviewed those candidates, invited an additional applicant whose name had been rejected by the committee, and who in due course recommended a list of candidates to the president; thereafter, the president conducted his own separate evaluation of the candidates recommended by the faculty before making his final selection. Thus, it is apparent that the committee's input into the decision-making process not only did not go directly to the final decision-maker, the president, but also was additionally screened and evaluated by the entire faculty whose actions regarding the committee's recommendations manifested their non-binding character. The role played by the faculty committee would seem to have less input into the final decision-making process than that of the employee's council which Bennett v. Warden, supra, held to be too remote to be subject to Sunshine Act coverage.
Appellants have presented two other arguments as to why neither the College of Law faculty nor the search and screen committee of the faculty is a "board" or "commission" for Sunshine Act purposes. First, appellants argue that by definition a board or commission is a body authorized to exercise limited quasi-legislative or quasi-judicial powers, or both, independently of the head of the department, powers which neither the faculty nor the faculty committee possessed. Were this case the first to construe the Sunshine Act, such argument might fall on attentive ears, but Palm Beach v. Gradison, 296 So.2d 473 (Fla. 1974), as well as numerous other cases, teach that the statutory words "board or commission" have no such narrow or restrictive meaning. Secondly, appellants argue that application of the Sunshine Act to the faculty of the College of Law or its committee violates constitutional principles of academic freedom. We are not persuaded by that argument. See In re Dinnan, 661 F.2d 426 (5th Cir.1981).
Other states having acts similar to the Florida Sunshine Law have refused to apply open meeting legislation to law school and college faculty and student/faculty committees. The Georgia Supreme Court in McLarty v. Board of Regents of the University System of Georgia, 231 Ga. 22, 200 S.E.2d 117 (1973), the North Carolina Supreme Court in Student Bar Association Board of Governors v. Byrd, 293 N.C. 594, 239 S.E.2d 415 (1977), and the Tennessee Appellate court in Fain v. Faculty of the College of the University of Tennessee, 552 S.W.2d 752 *586 (Tenn. App. 1977), each determined that its state open meeting act did not apply to committees similar to the search and screen committee involved in this case. Those cases are persuasive authority for the decision we reach here.
In the case of Krause v. Reno, 366 So.2d 1244 (Fla. 3d DCA 1979), relied upon by the trial court, the Third District Court of Appeal construed the Sunshine Act to apply to a predominatly lay advisory board appointed to advise the city manager of the City of Miami regarding the appointment of a new chief of police. Both on the facts and in principle the instant case and the Krause case have much in common. In Krause, the city manager of the City of Miami, who alone possessed the power of selecting and appointing the city police chief, appointed a five member citizens advisory committee to screen and evaluate applicants for the position, and to make recommendations as to the four or five found best qualified, which recommendations, while not binding upon the city manager, were to be given full consideration. Here, the president of the University of Florida, having the sole authority to select and appoint a dean of the College of Law, called upon the faculty of the College of Law to appoint a search and screen committee to review and evaluate applicants and recommend those whom the committee found to be best qualified, which recommendations, while not binding on the president, were to be given full consideration. We have sought to distinguish this case from the Krause case by pointing out that (1) here the faculty was the equivalent of staff, while in the Krause case the committee consisted, with one exception, of lay persons, and (2) here the faculty committee's input was necessarily more restricted and remote since the committee reported to the faculty as a whole, which latter body made the ultimate recommendations to the president, while in the Krause case the lay advisory committee met with and reported directly to the appointing authority, the city manager. Absent the validity of those distinguishing factors, our decision here would conflict with the Third District Court's in decision in Krause v. Reno, supra.
The judgment of the trial court is reversed and this cause remanded for entry of a final judgment for the defendants, appellants herein. Our reversal of that judgment requires that we likewise reverse the separate order awarding attorney's fees to the plaintiffs in the trial court, which we do without reaching or deciding the merits of the issues raised on the separate appeal from that order.
REVERSED and REMANDED.
THOMPSON, J., concurs.
WIGGINTON, J., dissents.
WIGGINTON, Judge, dissenting.
The majority opinion finds today that the dean search committee at the University of Florida law school should not be governed by the Sunshine Law. I am troubled by this judicial creation of an exemption not established by the legislature, and I must respectfully dissent.
The Sunshine Law does not define the terms "board or commission" or "state agency or authority," but it is clear that the University of Florida, which is created by statute, Section 240.2011(2), Florida Statutes, and all other state universities are state agencies. Lieberman v. Marshall, 236 So.2d 120, 125 (Fla. 1970). President Marston is the chief executive officer of a public agency, and it is through his office that many of the statutory powers and duties of the university are carried out. He is responsible for the operation and administration of the university, including appointing, removing and reassigning vice presidents, academic deans, and other policy level positions reporting directly to the president. Section 240.227, Florida Statutes. The university president may individually be regarded as a state agency as defined by Chapter 119, Florida Statutes,[1] and by the Government Reorganization Act, Chapter 20, Florida Statutes.
*587 Significantly, the powers, duties and authority vested with the university are vested with the university president "or his designee." Section 240.202, Florida Statutes.
In order to fulfill his function, President Marston designated a committee to aid in the ultimate selection and appointment of a new dean for the college of law. Following the dictates of the university constitution requiring that the president consult with a special committee of at least three faculty members elected by the faculty of the college, he called upon the faculty and a sub-committee thereof to carry out a decanal search, trim the list and forward to him its recommendations. Without any doubt, this search committee, comprised of law school faculty members, student leaders and a learned, accomplished and vitally interested member of The Florida Bar (who was appointed to the committee directly by the president), sought and received numerous applications from which it removed certain persons from further consideration by the law school faculty and President Marston.
This search committee found itself in the decision making process. It decided on the applicants whose names would be submitted to the faculty for consideration. Conversely  and this point cannot be overstated  the committee decided which applicants would not be considered for the dean's job. The committee's screening process eliminated the vast majority of candidates from being considered by President Marston.
The majority opinion's characterization of this decision making as "merely a winnowing process" unfairly minimizes the role the committee played. I think it plain that if the university's decision on who to hire as dean may be covered by the Sunshine Law, then the decision on who not to hire must be covered, too.
The most troubling effect of the majority opinion is that it may create the perception of a carte blanche exemption from the Sunshine Law for all university search and screen committees. In my view, the legislature, not the court, is the proper body to decide whether such an exemption should exist.
Following rules of statutory construction, we must conclude that the legislature has decided against such an exemption. Florida Statutes expressly exempt certain activities of search committees for chancellor of the university system,[2] and for selection of university presidents.[3] It would be tempting to reason that because these search committees are exempt then, a fortiori, other search committees would be likewise exempt. However, to avoid the appearance of establishing public policy rather than interpreting it, I believe the proper statutory construction is encompassed in the legal principle expressio unius exclusio alterius. As applied to this case, it means that when the legislature specifically named certain committees that are to be exempt from the Sunshine Law, and it did not create exemptions for similar committees, we must infer that the legislature intended that these unnamed committees not be exempt.
The inevitable conclusion is that Sunshine Law exemptions for search committee activities have not been overlooked by the legislature, and in fact have been provided, but only in certain specific and limited instances.
The faculty search and screen committee, through delegation of statutory power by President Marston in the decanal selection process and by performing important activities leading toward the final selection of a college dean, was raised from a staff function to the status of a board or commission subject to compliance with the Sunshine Act. See News-Press Publishing Co., Inc. d/b/a Fort Myers News-Press v. Carlson, et al., 410 So.2d 546 (Fla.2d DCA 1982).
The search committee members complain that application of the Sunshine Law discourages the robust exchange of ideas and that continuous exposure will cause that group to become "sunburned." This state's adoption of the Sunshine Law has opened *588 the doors on backroom politics and is compelling government to be accountable. Should there be a person selected for search committee duty who is meek at heart and cannot or will not candidly evaluate and openly articulate that which is his responsibility, then his chair can be filled with one who is made of sterner stuff. And so it must be with those who seek selection for high public positions, whether that be in government or education. Such is the legislative design embodied in the Sunshine Law.
The legislature had the opportunity to exempt the search committee for the university president's selection and appointment of academic deans (§ 240.227(5)), but refrained, thus maintaining openness in the selection process for viewing, evaluation and opinion by the public. This law can certainly withstand those citizens and members of the media who are curious and interested or who may be critical of our government and the decisions it makes.
Finally, it must be noted that the system indeed worked. The trial court's order permanently enjoining the search committee from holding meetings without compliance with the requirements of the Sunshine Law, although causing some short-term anguish and gnashing of teeth, did in fact cause to be selected excellent and qualified candidates, one of whom was finally appointed by President Marston. In the sunshine, the search committee acted responsibly and effectively in carrying out its charges and duties. This the appellants cannot deny.
Accordingly, I would affirm the trial court's order for permanent injunction.
Further, I would affirm the trial court's order granting appellee's attorney's fees and costs. The parties agree that responsibility for payment of the award of attorney's fees and costs, if due, shall be that of the agency, the University of Florida.
The facts surrounding the award of this fee appear to be novel in that the actions of appellee prevented the violation rather than seeking relief and pursuing penalties for violations after the fact.
Appellees sought and obtained temporary and permanent injunctive and declaratory relief requiring appellants to conduct all meetings of the decanal search and screen committee in compliance with the Sunshine Law. Although I would affirm the award of an attorney's fee without further factual support of committee improprieties, the deposition of the college's acting dean includes testimony that members of the search and screen committee interviewed and evaluated candidates for the deanship while attending the annual meeting of the Association of American Law Schools in Austin, Texas.
Section 286.011(4)[4] provides that "the court shall assess a reasonable attorney's fee" against the agency sued when a successful action "to enforce the provisions of this section" is brought. It is evident that the appellees prevailed in the action. The clear intention of the legislature was to provide for recovery of attorney's fees to any individual who successfully enforces the provisions of the Sunshine Law.
The appellants urge the court to construe the statute as precluding recovery of attorney's fees unless "a violation" of the act by the appellants is found. This argument is not persuasive as it would lead to the absurd result that litigants would refrain from bringing actions until after a violation occurred. Surely the public interest is best served when the impending violation is prevented by an injunctive action, as was taken in this case, rather than the violation occurring and irreparable harm befalling the public and those officials involved.
Appellees took swift and firm action to prevent the violation of the law and should *589 not now be penalized. Rather, they should be made whole for the diligence shown. It should be noted that abuses of this enforcement provision of the Sunshine Act can be prevented not only by denying attorney's fees to a non-prevailing party, but also by allowing an assessment of attorney's fees against an individual who files such an action if the court finds it was filed in bad faith and was frivolous.
Accordingly, I would also affirm the award of fees and costs ordered by the trial court.
NOTES
[1] As the Supreme Court noted in Occidental Chemical Co. v. Mayo, 351 So.2d 336 (Fla. 1977), at 342, n. 10, if the members of a collegial administrative body were obliged to avoid their staff during the evaluation and consideration stages of their deliberations, "the value of staff expertise would be lost and the intelligent use of employees would be crippled."
[2] While we do not overlook the presence on the committee of three non-faculty members (including two students as non-voting members) that factor does not materially detract from our concept of the committee as staff.
[3] See, Occidental Chemical Co. v. Mayo, 351 So.2d 336 (Fla. 1977).
[4] See, opinion letter to Alvin J. Taylor, 81 Fla. Atty. Gen. 51 (July 8, 1981).
[1] The Public Records law defines "agency" as "any state ... officer ... acting on behalf of any public agency." Section 119.011(2), Florida Statutes.
[2] Sec. 240.209(2).
[3] Sec. 240.209(3)(a).
[4] Section 286.011(4):

Whenever an action has been filed against any board or commission or any state agency or authority ... to enforce the provisions of this section ... and the court determines that the defendant or defendants to such action acted in violation of this section, the court shall assess a reasonable attorney's fee against such agency, and may assess a reasonable attorney's fee against the individual filing such an action if the court finds it was filed in bad faith or was frivolous... .