722 So.2d 891 (1998)
Frank L. ZORC, Appellant,
v.
CITY OF VERO BEACH, Florida, Appellee.
No. 97-0465.
District Court of Appeal of Florida, Fourth District.
December 2, 1998.
Rehearing Denied January 12, 1999.
*893 Jonathan D. Kaney Jr. and Jonathan D. Kaney III of Cobb Cole & Bell, Daytona Beach and Kathaleen Inman and Michael D. Battaglini, Vero Beach, for Appellant.
Robert N. Sechen, City Attorney, Vero Beach and Angela C. Flowers and Elizabeth M. Rodriguez of Kubicki Draper, Miami, for Appellee.
Edward M. Mullins and Lornette A. Reynolds of Steel Hector & Davis LLP, Miami, for Amicus Curiae-First Amendment Foundation, Florida Society Newspaper Editors, and Vero Beach Press-Journal.
J. Bruce Bowman of Dennis & Bowman, P.A., Tallahassee, for Amicus Curiae-Florida League of Cities, Inc.
SHAHOOD, J.
Appellant, Frank Zorc, appeals from Amended Summary Final Judgment entered in favor of appellee, City of Vero Beach ("City"), finding inter alia that the City did not violate the Sunshine Law in any of three closed-door meetings held March 6, 1995, April 4, 1995 and May 9, 1995, wherein the City discussed its participation as a creditor in pending litigation in the bankruptcy proceedings brought by Piper Aircraft Corporation ("Piper"). The trial court held that the City was authorized to conduct such closed-door meetings under section 286.011(8), Florida Statutes (1995), and that any violations which may have occurred were cured through the City's open-door meeting held on June 21,1995. We disagree and reverse and remand.

Background
In April 1985, the City and Zorc entered into a thirty-year lease for parcel 44, a piece of property owned by the City at the Vero Beach Municipal Airport, adjacent to the Piper facility. In August 1986, the City and Zorc entered into another thirty-year lease for parcel 43, also adjacent to the Piper facility.
Since 1959, Piper operated an aircraft installation facility in Vero Beach. Piper maintained certain underground storage tanks at this site containing chemicals used in its business, including trichloroethylene ("TCE"). In October 1978, an analysis of the City's water supply revealed that a water well located close to Piper's storage tanks, was contaminated by TCE. This contamination affected the City's property, including the portion leased to Zorc. In 1990, the Piper site was added to the National Priorities List, a prioritized list of properties affected by uncontrolled releases of hazardous substances requiring remedial evaluation and response pursuant to the Comprehensive Environmental Response, Compensation and Liability Act.
In 1991, Piper filed for bankruptcy. The City was a creditor in the Piper bankruptcy after filing a claim "in the approximate amounts of $136,000 for utility claims and $49,000 for claims for rent and gross receipts tax due to the airport." During that time, Piper and the Environmental Protection Agency negotiated a Consent Decree in order to assure that sufficient remedial action was taken to cleanup the area. Prior to Piper presenting the Consent Decree for final approval before the Federal District Court, the Consent Decree had to first be approved by the Bankruptcy Court.
Since the proposed Consent Decree filed with the Bankruptcy Court did not contain any provisions including the City's adjacent property in Piper's cleanup efforts, the City *894 held a series of closed-door meetings with its attorneys, discussed below, to discuss strategy regarding its inclusion in the Piper Consent Decree.
As a result of the TCE contamination of his leased property, Zorc incurred problems obtaining refinancing for his property. In October 1994, Zorc voiced his concerns to the City regarding the renewal of his mortgage which was to mature on September 1, 1995. His lender was concerned that TCE might have migrated onto his property. In January 1995, Zorc thanked the City for what he believed to be its cooperation toward solutions regarding the possible contamination problem on the property he leased from the City and in clearing up any "stigma" regarding contamination of the property. Zorc kept the City informed of his discussions with the EPA in an attempt to determine if his property near the Piper site required cleanup.

March 6, 1995 Closed-Door Meeting
In a notice dated March 5, 1995, the City called a Special City Council Meeting for March 6, 1995. Included on the agenda was a private meeting, not open to the public, to discuss the following "matters in litigation: U.S. Bankruptcy Court, In re: Piper Aircraft Corporation, Debtor, Case 91-31884-BKC-RAM, Chapter 11." The notice identified those persons who would be in attendance at the meeting, and provided that "[v]erbatim transcript of the City Attorney's litigation proceedings shall be made by an independent court reporter which will be filed with the City Clerk and open to the public for inspection after the conclusion of the litigation."
In part, this meeting was intended to be a "strategy session" concerning the Piper bankruptcy. At the meeting, the City Attorney informed the City Council as to the City's status as a creditor in the Piper bankruptcy. The City Council was also advised that the City was considering filing an additional claim in the Piper bankruptcy proceeding to protect its interests in the TCE contamination cleanup efforts being made at the Piper site. Special counsel for the City advised the City as to its options to protect its property in the face of the Consent Decree being negotiated between Piper and the EPA and which was to be presented before the Bankruptcy Court for approval. He explained that the Consent Decree did not contain any provisions allowing for the City to participate in the cleanup process in order to protect the City's property, which included Zorc's leased property.
Special Counsel presented three options: (1) do nothing and assume that the EPA will require Piper to clean up all properties affected by TCE, including the City's; (2) to file a motion in Bankruptcy Court objecting to the proposed Consent Decree prior to the court's approval and to request an amendment to the document to assure that the City's property will be included in the cleanup; and (3) to file a motion to intervene when the EPA seeks approval of the Consent Decree in Federal District Court.
After discussing the various options, Special Counsel recommended that the City pursue each of the three options. Included in this discussion was how the consent agreement was going to affect Zorc and the City's legal obligation to him over the contaminated property. A motion was passed by the City Council accepting counsel's recommendations and allowing counsel to "take whatever action is necessary to get this additional paragraph in the [consent] agreement ... including sending a letter to the DEP to start the clock running on a potential friendly suit with DEP, including in the bankruptcy filing an objection to the consent agreement as it's currently worded, and, lastly, to intervene in the suit to be filed by the United States versus Piper, if necessary." On April 3, 1995, the City filed its objection to the approval of the Consent Decree by the Bankruptcy Court, claiming that it was a creditor of Piper's and had a particular interest in the cleanup efforts set in the Consent Decree due to its ownership of property adjacent to the Piper site.

April 4, 1995 Closed-door Meeting
On March 30, 1995, notice of an April 4, 1995 Special City Council Meeting was published to discuss the Piper bankruptcy proceeding and another unrelated litigation matter. The notice included those persons scheduled to attend the meeting.
*895 The meeting consisted primarily of a status report by the City Attorney on the Piper bankruptcy. The City Attorney updated the City Council as to the action taken since the March 6th meeting, including the filing of the City's objection to the Consent Decree and an update on the various options available to the City. Further mention was made of Zorc's potential claims against the City and the related reasons as to why the City must continue to get involved in the cleanup efforts.

May 9, 1995 Closed-Door Meeting
Notice of the May 9, 1995 Special City Council Meeting was published on May 8, 1995. The sole purpose of the meeting was to discuss strategy and possible settlement in the Piper bankruptcy litigation. Those persons in attendance at the meeting were listed in the notice.
The City Attorney updated the City on the action authorized by the City in a previous meeting, including the filing of an objection to the Piper Consent Decree in Bankruptcy Court and negotiations with Piper and the EPA. Special Counsel requested authorization to enter into final negotiations with Piper and the EPA and to review the proposed protective language for inclusion into the Consent Decree.
Early in the meeting, Councilman Ginn asked whether the Piper Consent Decree was part of the agenda set out in the public notice and whether this was something that should be done in a public setting. The City Attorney explained that it was part of the agenda since the Piper Consent Decree must be signed by the Bankruptcy Court and since the City had filed its objection to the decree in the Bankruptcy Court. In response to the Councilman's concerns regarding the need for this meeting to be held in public, the City Attorney explained that the nature of the meeting was that of a strategy session, which was exempted from the requirements of the Sunshine Law. The City Attorney explained that the strategy session will settle the City's claims with respect to the Consent Decree, even though their financial claims would remain pending.
The Council members devoted much of the discussion to making sure that the tenants at the airport were covered under the consent agreement. Specific mention was made regarding Zorc's financing problem's as a result of his lender's concerns that TCE contamination may affect his leased parcel and how the consent agreement should allay the fears of lenders. The Council members decided to make the record public as soon as the Bankruptcy Court approved the Consent Decree, but prior to the Federal District Court's approval, because the bankruptcy litigation as it pertained to the City's contamination claims would then be concluded.
The City passed a motion directing its attorneys to proceed to ensure that the proposed language was included in the Consent Decree and to sign the appropriate documents to finalize the Consent Decree. The motion further directed "the City staff to encourage and assist Piper Aircraft to convince lending institutions that this site is not such that they would have any liability for the cleanup ... [t]o allay their fears of financing any of the tenants out there." The City also directed that all materials and transcripts be immediately made available to the public.

June 21, 1995 Public Meeting
On May 26, 1995, Zorc filed suit against the City seeking declaratory and injunctive relief claiming that the City violated the Sunshine Law, section 286.011(8), by holding a closed attorney-client session at the May 9, 1995 meeting.[1] Thereafter, the City held a public meeting on June 21, 1995 to: (1) reconsider the actions taken by the City Council at a special called meeting of May 9, 1995, concerning advice on the matter in litigation re: the U .S. Bankruptcy Court and Piper Aircraft Corporation as a debtor; (2) to consider the actions and alternatives on matters related to the Piper Aircraft Corporation Super Fund Site and all the neighboring properties; and (3) to discuss strategy in handling *896 of a matter in litigation regarding Frank L. Zorc vs. the City of Vero Beach.
The City reiterated that the action taken at the May 9, 1995 meeting was to get the approval of the language that it wanted to go into the Consent Decree. Special Counsel advised the City that nothing had occurred which would preclude reconsideration and that no documents needed to be signed at that time since the Bankruptcy Court had approved the Consent Decree prior to the City's changes. At that time, the public, including Zorc, was provided with the opportunity to speak on the issues to be considered by the City. Zorc read a prepared statement to the City regarding the alleged "secret" meetings held by the City in violation of the Sunshine Law where discussions were had concerning the contaminated land and his leased property. The City voted against the motion to reconsider the wording it sought in the Consent Decree.
On January 20, 1997, following a hearing on the parties' motions for summary judgment, the trial court entered an Amended Order and Summary Final Judgment in favor of the City finding there to have been no violation of the Sunshine Law, and further, that any violation of the Sunshine Law, if one occurred, was cured by the June 21 public meeting.

Government-in-the-Sunshine
The purpose of the Sunshine Law is "to prevent at non-public meetings the crystallization of secret decisions to a point just short of ceremonial acceptance." See Monroe County v. Pigeon Key Historical Park, Inc., 647 So.2d 857, 860 (Fla. 3d DCA 1994) (quoting Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla.1974)). As such, Florida requires governmental entities to conduct their business at open, public meetings, "in the sunshine." Any meeting in which official acts are to be taken are to be open to the public, and no "resolution, rule or formal action shall be considered binding except as taken or made at such meeting." § 286.011(1), Fla.Stat. (1995). In 1992, a constitutional amendment elevated the public's right to government in the sunshine to constitutional proportions. See Monroe County, 647 So.2d at 868; Art. I, § 24(b), Fla. Const. The language in Article I, Section 24(b) of the Florida Constitution is virtually identical to that of section 286.011(1), Florida Statutes.
In 1993, an exemption to the Sunshine Law was created, enabling a governmental entity to meet privately with its attorney provided that certain conditions are met. Section 286.011(8), Florida Statutes (1995) provides as follows:
(8) Notwithstanding the provisions of subsection (1), any board or commission of any state agency or authority or any agency or authority of any county, municipal corporation, or political subdivision, and the chief administrative or executive officer of the governmental entity, may meet in private with the entity's attorney to discuss pending litigation to which the entity is presently a party before a court or administrative agency, provided that the following conditions are met:
(a) The entity's attorney shall advise the entity at a public meeting that he or she desires advice concerning the litigation.
(b) The subject matter of the meeting shall be confined to settlement negotiations or strategy sessions related to litigation expenditures.
(c) The entire session shall be recorded by a certified court reporter. The reporter shall record the times of commencement and termination of the session, all discussion and proceedings, the names of all persons present at any time, and the names of all persons speaking. No portion of the session shall be off the record. The court reporter's notes shall be fully transcribed and filed with the entity's clerk within a reasonable time after the meeting.
(d) The entity shall give reasonable public notice of the time and date of the attorneyclient session and the names of persons who will be attending the session. The session shall commence at an open meeting at which the persons chairing the meeting shall announce the commencement and estimated length of the attorney-client session and the names of the persons attending. At the conclusion of the attorneyclient session, the meeting shall be reopened, *897 and the person chairing the meeting shall announce the termination of the session.
(e) The transcript shall be made part of the public record upon conclusion of the litigation.
In construing the statute, it is well settled that the Sunshine Law, enacted for the public benefit, should be liberally construed to give effect to its public purpose while exemptions should be narrowly construed. See City of Dunnellon v. Aran, 662 So.2d 1026,1026 (Fla. 5th DCA 1995); Board of Pub. Instruction of Broward County v. Doran, 224 So.2d 693, 699 (Fla.1969).

Presence of unauthorized persons at closed meeting
Zorc claims that unauthorized persons were in attendance at the City Council closed-door meetings held March 6, 1995, April 4, 1995 and May 9, 1995 in violation of the Sunshine Laws. We agree in part, and find that the City violated section 286.011(8), Florida Statutes, by allowing certain persons to attend the closed attorney-client sessions.
In addition to City Council members in attendance at the closed-door meetings, the following persons were in attendance at March 6th meeting: City Attorney; City Manager; Special Counsel; City Clerk; Airport Director; Director of Public Works and Engineering; and Assistant City Attorney. At the April 4th meeting the following persons were in attendance: City Attorney; City Manager; Special Counsel; Deputy City Clerk; City Engineer; Airport Director; and Planning Director. At the May 9th meeting the following persons were in attendance: City Attorney; City Manager; City Clerk; Airport Director; and Special Counsel.
Subsection 268.011(8) provides that any board or commission of any state agency or authority or any agency or authority of any county, municipal corporation, or political subdivision, and the chief administrative or executive officer of the governmental entity, may meet in private with the entity's attorney to discuss pending litigation. Further, subsection 268.011(8)(c) provides that the entire session be recorded by a certified court reporter.
Under School Board of Duval County v. Florida Publ'g Co., 670 So.2d 99 (Fla. 1st DCA 1996) and Attorney General Opinions 98-06 (1998) and 95-06 (1995), only those persons listed in the statutory exemption, i.e., the entity, the entity's attorney, the chief administrative officer of the entity and the court reporter, are authorized to attend closed attorney-client sessions to discuss pending litigation. Other staff members and consultants are not allowed to attend. See Duval County; 19 Government-In-The-Sunshine Manual 37 (ed.1997).
In finding the presence of staff members and consultants at closed meetings to be in violation of the Sunshine Law, the First District in Duval County explained that prior to the enactment of the exemption under subsection 268.011(8), the Sunshine Law had been construed to apply to all meetings between governmental agencies and their attorneys conducted for the purpose of discussing settlement of pending litigation. No attorney-client privilege was recognized. See Duval County, 670 So.2d at 100 (citing Neu v. Miami Herald Publ'g Co., 462 So.2d 821 (Fla.1985)). However, through the enactment of the exemption, section 268.011(8) permits any governmental agency, its chief executive officer and attorney to meet in private if the agency is a party to litigation and the attorney desires advice concerning settlement negotiations or strategy related to litigation expenditures. See id. The amendment was not, however, intended to permit nondesignated personnel to discuss settlement matters in private with the agency:
This act simply provides a governmental entity's attorney an opportunity to receive necessary direction and information from the government entity. No final decisions on litigation matters can be voted on during these private, attorney-client strategy meetings. The decision to settle a case, for a certain amount of money, under certain conditions is a decision which must be voted upon in a public meeting.
Id. (quoting Staff of Fla.H.R.Comm. on Gov't Operations, CS/HB 491 (1993) Final Bill *898 Analysis & Economic Impact Statement at 3).
The Duval County court also relied in part upon an attorney general opinion which concluded that authorized consultants could not attend a closed meeting on litigation strategy between the city's governing board and its attorney. See id. at 100-101; Op. Att'y Gen. Fla. 95-06 (1995). In concluding that the exemption should be construed narrowly, the Attorney General noted that:
Section 286.011(8), Florida Statutes, by its terms, is not expansive but is limited to particular individuals who are, in their official capacity, authorized to discuss particular limited subjects, i.e., litigation strategy or settlement negotiations. Nothing in the language of the statute authorizes the attendance of persons other than those officials who are designated to participate in these private strategy sessions.
Op. Att'y Gen.Fla. 95-06 (1995). In reaching such determination, the Attorney General relied upon the rule of statutory construction that "[when] a statute specifically sets forth those things upon which it is to operate, it is to be construed as excluding from its operation all things not expressly mentioned." Id. at 101.
In reviewing the propriety of those persons in attendance at the closed meetings, we find that the attendance of Special Counsel falls within the exemption of section 286.011(8). Section 286.011(8) authorizes a government entity to meet in private with the entity's attorney to discuss pending litigation. See Op. Att'y Gen.Fla. 98-06 (1998) (both a school board attorney and a litigation attorney may meet with the school board and the superintendent in a closed session to discuss matters relating to pending litigation.). In City of Dunnellon v. Aran, 662 So.2d 1026 (Fla. 5th DCA 1995), the Fifth District held that the failure of the mayor to disclose the names of lawyers from the City Attorney's office and lawyers from a specially retained out-of-town law firm participating in a closed attorney-client session violated subsection 286.011(8)(d). Under the holding in Dunnellon, the City was in compliance with the section 286.011(8)(d), since the names of Special Counsel retained by the City were announced prior to the meeting.
We do, however, find that the attendance of the City Clerk and Deputy City Clerk at closed meetings to be improper. In support, the City relies upon the City's Charter which provides that "[t]he City Clerk shall give notice of all City meetings to the Councilmen and the public as required by law and shall attend all such meetings in person or by designee and shall keep minutes of the proceedings."See Vero Beach, Fla., Ordinance § 3.05 (1982). However, section 286.011(8)(c) provides for all closed attorneyclient meetings to be recorded by a certified court reporter, thereby negating the need for the City Clerk to attend such meetings. Clearly, any conflict between the City Charter and section 286.011(8) is negated under Article VIII, Section 2(b) of the Florida Constitution which provides that municipalities may exercise any power for municipal purposes except as provided by law. (emphasis supplied). Municipal ordinances are inferior to laws of the state and must not conflict with any controlling provision of a statute. See Thomas v. State, 614 So.2d 468, 470 (Fla.1993). A municipality cannot forbid what the legislature has expressly licensed, authorized or required, nor may it authorize what the legislature has expressly forbidden. See Thomas v. State, 583 So.2d 336, 340 (Fla. 5th DCA 1991), approved, 614 So.2d 468 (Fla. 1993).
As to the remaining attendees, while the City acknowledges the Duval County decision, it nevertheless claims that the remaining attendees fall under the expansive title of Chief Administrative Officer and Executive Officer as set forth in section 286.011(8), when read in conjunction with section 1.01, Florida Statutes.
Section 1.01 provides in relevant part:
In construing these statutes and each and every word, phrase, or part hereof, where the context will permit:
(6) Reference to any office or officer includes any person authorized by law to perform the duties of such office.
We reject the City's argument that under section 1.01 those staff members who are *899 delegated authority and who report to the City's Chief Administrative Officer can attend closed attorney-client meetings. The City claims that the City Manager, as its Chief Executive Officer, has broad duties in managing and operating the City. Thus, he is entitled to assemble his directors to provide necessary information at the attorney-client meetings.
The First District in Duval County specifically rejected the argument that administrative staff and consultants are a necessary part of the negotiation process as the Superintendent and School Board members are free to meet with staff in private at any time since staff members are not subject to the Sunshine Law. 670 So.2d at 101. The same analogy applies in the instant case. Further, sections 1.01 and 286.011(8) can not be read in pari materia as suggested by the City, as it is a basis tenet of statutory construction that a specific statute covering a particular subject area always controls over a statute covering the same and other subjects in more general terms. McKendry v. State, 641 So.2d 45, 46 (Fla.1994). The more specific statute, section 286.011(8), is considered to be an exception to the general terms of the more general statute, section 1.01. See id.; C.S. v. S.H., 671 So.2d 260 (Fla. 4th DCA), review denied, 680 So.2d 424 (Fla.1996).
As such, we find that the attendance of the City Clerk, Airport Director, and Director of Public Works and Engineering at the March 6th meeting; the attendance of the Deputy City Clerk, City Engineer, Airport Director and Planning Director at the April 4th meeting; and the attendance of the City Clerk and Airport Director at the May 9th meetings were in violation of the Sunshine Law.

Closed-door meetings beyond scope of section 286.011(8)
In order to fall within the ambit of the exemption, the City must satisfy the conditions set forth in section 286.011(8). Section 286.011(8) and subsection (b) enables a governmental entity to meet privately with its attorney to: (1) discuss pending litigation; (2) to which the entity is presently a party before a court or administrative agency; (3) provided that the entity's attorney shall advise the entity at a public meeting that he or she desires advice concerning the litigation; and (4) that the subject matter of the meeting is confined to settlement negotiations or strategy sessions related to litigation expenditures. (emphasis supplied). We find that the City failed to satisfy conditions (3) and (4) of the statute as to the May 9th meeting only.

Pending Litigation
As to the first element of section 286.011(8), we find that the City's involvement in the Piper bankruptcy proceedings qualified as "pending litigation" within the meaning of the statute.
Legislative history provides that section 286.011(8) was "intended to create a level playing field between the governmental agency and its adversaries." See Fla. H.R.Comm. on Governmental Operations, Subcomm. on Governmental Accountability, unpaginated partial transcript of tape recording of proceedings (February 23, 1993 re: House Bill (HB) 491 (1993 Regular Session) (available at Fla. Dep't of State, Div. of Archives, Tallahassee, Fla.)). In this case, in addition to the City's claims as a creditor in the Piper bankruptcy, the City was trying to ensure that the Piper Consent Decree, which had yet to be reviewed and approved by the Bankruptcy Court, protected the interests of the City. Since the City's interests were not protected by the Consent Decree, its interests were adverse to the EPA and Piper. Thus, the City's interaction with Piper and the EPA regarding its claim as to Piper's cleanup efforts was by necessity adversarial in nature.
Because Piper was in bankruptcy, all litigation involving Piper had to first be brought before the Bankruptcy Court, including the negotiation and approval of the Consent Decree between Piper and the EPA. Thus, not only was the City's utility and rent claims pending before the Bankruptcy Court, but so too was the City's adversarial claim concerning the Consent Decree and the contamination issue.

Presently a party
As to the second element, we find that the City was "presently a party" to pending litigation. In Brown v. City of *900 Lauderhill, 654 So.2d 302, 303 (Fla. 4th DCA 1995), this court held that "presently" a party within section 286.011(8) "is not defined as `now,' i.e., this precise point in time. Rather, that word is properly applied to a time period from now into the immediate future; in other words, a short while." Id. (emphasis in original; footnote omitted) (although the City of Lauderhill was not a nominal party in an attorney's fees litigation brought in the mayor's name at the time of the private meeting with its counsel, its interests dictate that it would soon be involved in any litigation necessary to protect or enforce its interest in the fee).
In this case, the City was presently a party in ongoing litigation by virtue of its already pending claims in the bankruptcy proceedings and its contemplated involvement as to the contamination issue currently being negotiated between the EPA and Piper. Like Brown, the City was a party to pending litigation despite the fact that it had not yet filed its claim, but contemplated doing so in the immediate future.

Advice concerning litigation confined to settlement negotiations or strategy related to litigation expenditures
As to the last two elements, we find that the City exceeded the scope of section 286.011(8). The closed meeting went beyond the permissible scope of a "strategy session." We find that the May 9th meeting involved decisive action in violation of the Sunshine Law. While there is no bright-line rule as to when advice becomes decisive action, it is apparent from the record that discussions concerning the Consent Decree went beyond the strict parameters of settlement negotiations and strategy sessions related to litigation expenditures.
In arguing that the closed door meetings did not exceed their permissible scope, the City claims that the March 6 meeting merely set the parameters for the negotiations and the course of action to be pursued and that the May 9 meeting only confirmed the course of action already initiated. It maintains that no formal action was taken during the May 9 session. We reject such assertion.
Section 286.011(1) provides that:
All meetings of any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation ... at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule, or formal action shall be considered binding except as taken or made at such meeting.
At the May 9th meeting, Special Counsel requested authorization to enter into final negotiations with Piper and the EPA regarding the Consent Decree and for the City Council to review and approve the proposed protective language for inclusion into the Consent Decree. Early in the meeting, one Councilman questioned whether the City could take such decisive action regarding the proposed language at the closed-door meeting without running afoul of the Sunshine Law. The City Council was assured that once the agreement was signed amending the language in the Consent Decree and the Consent Decree was approved by the Bankruptcy Court, the "litigation" would be at an end as to the contamination issue, and what transpired at the private meeting would have to be released to the public. Special Counsel was particularly concerned that discussing the settlement in a public forum, could "potentially be an opening of a door for other people to get into the Consent Decree." In so doing, individual citizens could intervene in the Piper Consent Decree and delay or infringe on the City's settlement. As such, Special Counsel recommended that the City approve the Consent Decree language and continue with the settlement behind closed doors to prevent outside intervention.
In addition, discussions were had regarding Zorc's financing problems as a result of his lender's concerns that TCE contamination may affect his leased parcel and how the Consent Decree should allay the fears of lenders. The City not only passed a motion directing its attorneys to proceed with the approved language in the Consent Decree and to sign the appropriate documents, it also passed a motion requesting that its City staff encourage and assist Piper in allaying the fears lending institutions regarding any liability they might incur in the cleanup efforts *901 in order to forestall any problems with the City's tenants' financing efforts. This action was outside the scope of the agenda set by the City.
In concluding that the City went beyond the scope of section 286.011(8), we find the statute's legislative history to be instructive:
This act is not an attempt to provide a means for government to meet behind closed doors to accomplish goals out of the sunshine. This act simply provides a governmental entity's attorney an opportunity to receive necessary direction and information from the governmental entity. No final decisions on litigation matters can be voted on during these private, attorneyclient strategy meetings. The decision to settle a case, for a certain amount of money, under certain conditions is a decision which must be voted upon in a public meeting.
See Staff of Fla.H.R.Comm. on Gov't Operations, CS/HB 491 (1993) Final Bill Analysis & Economic Impact Statement at 3. Other than legislative history, there is little case law defining "settlement negotiations" or "strategy related to litigation expenditures." See Freeman v. Times Publ'g Co., 696 So.2d 427, 428 (Fla. 2d DCA 1997) ("settlement negotiations," did not encompass a final judgment entered 25 years prior. While the lawsuit remained pending, it was not in a posture where it could be settled as a typical tort or contract action is settled either before judgment or while pending appeal. The possible need for closed-doors under "strategy related to litigation expenditures," could exist where the federal court ordered School Board to pay attorney's fees to the plaintiffs.); Brown, 654 So.2d at 303 (city attorney may meet in private to discuss claims for attorney's fees).
We find that the action taken at the May 9th meeting authorizing counsel to include language in the Consent Decree and to sign whatever documents relating thereto which would settle the City's claim with Piper and the EPA on the contamination issue, was a formal action requiring a vote at a public meeting. This final course of action was taken for the sole purpose of eliminating the competing interests of its citizens from the process. As such, this action went beyond the scope of the exemption. The settlement of a case is exactly that type of final decision contemplated by the drafters of section 286.011(8) which must be voted upon in the sunshine. This position is further buttressed by the fact that the City subsequently held a public meeting on June 21, 1995, following the commencement of Zorc's lawsuit, where it publicly voted to deny reconsideration of the action previously taken at the May 9, 1995 meeting.
Further, we find that the action taken by the City Council at the May 9 meeting directing City Staff to allay the financing concerns of lending institutions involved with its tenants was outside of the noticed agenda and beyond the scope of the strategy session. While this court has held that it is permissible to deviate from a previously announced agenda where a public meeting has been properly noticed, there is no case law affording the same latitude to deviations in closed door meetings. See Law and Information Servs., Inc. v. City of Riviera Beach, 670 So.2d 1014 (Fla. 4th DCA), review denied, 678 So.2d 1287 (Fla.1996).

Open meeting was not an effective cure
On June 21, 1995, the City Council held an open public meeting to reconsider the action taken at the May 9, 1995 closeddoor meeting. In its Amended Order and Summary Final Judgment, the trial court held that the City Council reconsidered the action taken at the May 9 meeting, and through a vote, ratified the previous action taken, thereby curing any Sunshine Law violation which may have occurred. We find that the June 21 open meeting was not an effective cure. Only after the commencement of Zorc's lawsuit filed May 26, 1995, did the City attempt to cure the violation.
Section 286.011 provides that any meeting in which official acts are to be taken are to be open to the public, and no "resolution, rule or formal action shall be considered binding except as taken or made at such meeting." Under the Sunshine Law, a meeting is either fully open or fully closed; there are no intermediate categories. See Neu v. Miami Herald Pub. Co., 462 So.2d at 823.
*902 Courts have recognized the importance of public participation in open meetings. The Florida Supreme Court has stated that "specified boards and commissions ... should not be allowed to deprive the public of this inalienable right to be present and to be heard at all deliberations wherein decisions affecting the public are being made." See Board of Pub. Instruction of Broward County v. Doran, 224 So.2d 693, 699 (Fla.1969). Such meetings "should be a marketplace of ideas, so that the governmental agency may have sufficient input from the citizens who are going to be affected by the subsequent action of the municipality." See Town of Palm Beach v. Gradison, 296 So.2d 473, 475 (Fla.1974); 19 Government-In-The-Sunshine Manual at 48 (ed.1997).
One purpose of the government in the Sunshine Law was to prevent at nonpublic meetings the crystallization of secret decisions to a point just short of ceremonial acceptance. See Gradison, 296 So.2d at 477. Rarely could there be any purpose to a nonpublic pre-meeting conference except to conduct some part of the decisional process behind closed doors. See id... "When in doubt, the members of any board, agency, authority or commission should follow the open-meeting policy of the state." Id.
In recognizing that the Sunshine Law should be construed so as to frustrate all evasive devices, courts have held that action taken in violation of the law was void ab initio. See 19 Government-In-The-Sunshine at 58; Gradison. "Mere showing that the government in the sunshine law has been violated constitutes an irreparable public injury so that the ordinance is void ab initio." See Gradison, 296 So.2d at 477. The principle that a Sunshine Law violation renders void a resulting official action does not depend on a finding of intent to violate the law or resulting prejudice. Once the violation is established, prejudice is presumed. See Port Everglades Auth. v. International Longshoremen's Ass'n, Local 1922-1, 652 So.2d 1169,1171 (Fla. 4th DCA 1995).
In Gradison, a citizen's planning committee which conducted its activities at nonpublic meetings, was instrumental in the formulation of a comprehensive zoning plan which was perfunctorily adopted as a zoning ordinance by the town council at a public meeting. The comprehensive plan was approved in substantially the same form as that which had been submitted. The court held that the zoning ordinance, which was the summary approval of the recommendation of the planning committee's secret meetings, was void ab initio. See id.
In Tolar v. School Board of Liberty County, 398 So.2d 427 (Fla.1981), the Florida Supreme Court distinguished Gradison. In Tolar, school board members met privately to discuss ideas on reorganization, including removal of Tolar, the existing director of administration, and the abolishment of his position. At an open formal meeting, the school board members voted to abolish the position and transfer the director. At the meeting, Tolar was given the opportunity to express his views.
In upholding the actions of the board, the Tolar court reasoned that in Gradison, the town council gave summary approval to the citizens' planning committee's recommendations in a purely ceremonial public meeting. Tolar, 398 So.2d at 429. However, unlike Gradison, the court held that the board in Tolar took independent, final action in the sunshine voting to abolish the position. See id. The court held that Sunshine Law violations can be cured by independent, final action in the sunshine that is "not merely a ceremonial acceptance of secret actions and was not merely a perfunctory ratification of secret decisions at a later meeting open to the public." Id. at 429.
In Monroe County v. Pigeon Key Historical Park, Inc., 647 So.2d 857, 869 (Fla. 3d DCA 1994), the Third District also followed Tolar. In that case, an advisory committee met in violation of the Sunshine Law by holding two unnoticed meetings. 647 So.2d at 860. A properly noticed third public meeting was held and transcripts of the unnoticed meetings were made available to the public. The County then held two public meetings in which over 50 people testified. Rather than voting at the end of the first public hearing, the County tabled its vote until the second hearing at which time it approved a lease which was different from the one recommended *903 by the advisory committee. See id. The Third District held that subsequent governmental actions cured Sunshine Law violations in connection with the ratification of a lease finding that the county did not ceremonially accept or perfunctorily ratify recommendations of an advisory committee. 647 So.2d at 860.; see also B.M.Z. Corp. v. City of Oakland Park, 415 So.2d 735 (Fla. 4th DCA 1982) (where no evidence that any decision was made in private, subsequent formal action in the sunshine was not merely perfunctory ratification of secret decisions or ceremonial acceptance of secret actions).
Despite the Tolar standard of remediation, it must be emphasized that only a full, open hearing will cure a defect arising from a Sunshine Law violation. Such violation will not be cured by a perfunctory ratification of the action taken outside of the sunshine. See Spillis Candela & Partners, Inc., v. Centrust Savings Bank, 535 So.2d 694, 695 (Fla. 3d DCA 1988) (County Board of Rules and Appeals did not cure its committee's violation of Sunshine Law by perfunctory ratification of committee's report; only full, open hearing by Board would have cured problem); 19 Government-In-The-Sunshine Manual at 59; see also Port Everglades, 652 So.2d at 1171 (violation of Sunshine Law occurred requiring invalidation of contract awarded where port authority's selection and negotiation committee excluded bidder from each other's presentations; violation was not cured since selection and negotiation committee did not reconvene in the sunshine before the contract was awarded and port did not conduct a full, open hearing on the competing bidders for the contract, before ratifying the committee's recommendation).
In this case, subsequent to the filing of Zorc's lawsuit, the City convened an open meeting on June 21, 1995 to reconsider the actions taken at the May 9th closed door meeting which approved the language to be included in the Consent Decree which was being filed for approval with the Bankruptcy Court. While a copy of the transcript from the May 9 meeting was made public immediately after the meeting, the City failed to conduct a full, open hearing, curing its prior violations from the May 9 hearing.
At the open meeting, the City Attorney gave Council members a brief review of the action taken at the May 9 meeting and the status of the Consent Decree. He informed the City Council that the purpose of the meeting was to reconsider actions taken by the City Council at the May 9 meeting. Each Council member was provided with a transcript of that May 9 meeting for his or her review, however, the City Attorney stated that he would not review it at the open meeting. Councilman Jordan asked which part of the previous action taken needed or warranted reconsideration. Mayor Winchester concurred with Councilman Jordan stating that he was satisfied with the action previously taken and the wording approved for inclusion in the Consent Decree. Only Councilman Ginn expressed concern that this matter needed to be revisited and opened up for discussion. The City Attorney stated that while this meeting was not a public hearing, it could be opened for public comment.
The public was then provided the opportunity to speak on the issue, and Zorc read a prepared statement. The City then voted against the motion to reconsider the wording to be included in the Consent Decree that was previously approved on May 9.
It is evident from the record that the meeting was not a full reexamination of the issues, but rather, was merely the perfunctory acceptance of the City's prior decision. This was not a full, open public hearing convened for the purpose of enabling the public to express its views and participate in the decision-making process. Instead, this was merely a Council meeting which was then opened to the public for comment at the City's request. There was no significant discussion of the issues or a discourse as to the language sought to be included. The City Councilmen were provided with transcripts of the hearings, but none reviewed the language previously approved, and the Council subsequently voted to deny reconsideration of the wording. Under Tolar and its progeny, it is clear that the City did not effectively *904 cure its violation of the Sunshine Law emanating from the May 9 meeting.

Conclusion
We reverse and remand with directions to the trial court to enter declaratory judgment in favor of Zorc declaring that the City violated the Sunshine Law for the reasons stated herein and further direct that proceedings be conducted with regard to the injunctive relief requested.
As to any remaining issues, we affirm without comment.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
GUNTHER and STEVENSON, JJ., concur.
GUNTHER, J., did not participate in oral argument, but has had the opportunity to review the entire proceedings.
NOTES
[1] Zorc's suit was later expanded to include alleged violations at the April 4, 1995 and March 6, 1995 closed-door meetings.