PER CURIAM.
 

 Sarasota Citizens for Responsible Government, et al., (collectively referred to as “Citizens”) appeal a trial court’s judgment validating bonds proposed for issuance by the City of Sarasota and the County of Sarasota in furtherance of an agreement bringing the Baltimore Orioles to Sarasota
 
 *758
 
 for spring training.
 
 [1]
 
 On appeal in this Court, Citizens only allege Sunshine Law violations by the County. They do not challenge any other aspect of the bond validation proceedings, and they do not appeal the trial court’s determination that the City did not violate the Sunshine Law. For the reasons explained below, we affirm the trial court.
 

 I. BACKGROUND
 

 As the trial court summarized,
 

 [t]he Sarasota County Board of County Commissioners [Board] entered into a Memorandum of Understanding (MOU) with the Baltimore Orioles (Orioles) in July, 2009. The MOU obligated the Orioles, among other things, to relocate to Sarasota for spring training. Sarasota County is obligated to fund construction of facilities/facility improvements at the Ed Smith complex, the location within the City of Sarasota where the Orioles are obligated to conduct spring training activities, and other facilities located elsewhere in the County.
 

 Negotiation of the MOU with the Orioles followed unsuccessful attempts to retain the Cincinnati Reds in Sarasota and to secure relocation of the Boston Red Sox to Sarasota. In November, 2008, the [Board] instructed the County Administrator, James Ley, to initiate negotiations with the Orioles. Mr. Ley delegated this task to Deputy County Administrator David Bullock (Bullock). Negotiations between the County and Orioles began immediately and continued until the terms of the MOU were finalized in July, 2009. The MOU was approved by the [Board] at a public meeting on July 22, 2009. At that public hearing, the [Board] adopted an
 

 amended or modified Tourist Development Tax Ordinance, in part to provide part of the County’s funding obligation under the MOU; approved an Interlocal Agreement with the City which included an obligation of the City to convey the Ed Smith complex to the County, to transfer funds to the County to offset part of the cost of construction and to undertake responsibility for environmental remediation, if required, at the complex; and adopted a resolution authorizing issuance of bonds for the purpose of financing costs associated with the improvements required by the MOU. Simultaneously, the City also authorized issuance of bonds to fulfill its obligations pursuant to the [I]nterlocal [A]greement.
 

 More specifically, the MOU between the County and the Orioles states that the County shall provide “28.7 million to the Project” and that it is estimated the City’s contribution will be approximately $7.5 million, for a total not to exceed “$31.2 million from all governmental sources.” The MOU details that the proceeds of the County’s bond issuance is “expected to be approximately $18.7 Million,” that the proceeds of “[c]ash collections of one-half (1/2) of one percent (1%) of the County’s Tourist Development Tax” is “estimated to be approximately $2 million,” and that the County’s “cash contributions from legally available non-ad valorem revenues” will not exceed $3 million. The County is also required to maintain and contribute annually to a capital repair and improvements fund with the Orioles also contributing to this fund. The MOU further explains that the City’s bond issue serviced by funds from the State of Florida Office of Tourism, Trade and Economic Development
 
 *759
 
 (OTTED) or a cash equivalent of non-ad valorem revenues will be “in an amount no less than $7.5 million.”
 

 The MOU calls for the renovation of the Ed Smith Stadium complex, including a renovated clubhouse, batting cages, pitching mounds, practice fields, parking facilities, utilities, etc. Additionally, the MOU calls for renovations at the Orioles’ minor league spring training facilities located at County-owned Twin Lake Park, including practice fields, a renovated clubhouse, administrative offices, batting cages, utilities, weight rooms, pitching mounds, etc. The MOU provides that the Orioles’ lease of these facilities commences on November 1, 2009 and continues through October 31, 2039. The Orioles may not relocate its major league and minor league spring training operations from Sarasota during this lease term, and the Orioles’ rent for this lease term is $1.00. However, the Orioles are generally responsible for the operating, maintenance, and repairs expenses. The Orioles are to manage the ticketing and parking operations and are to receive the revenue from concessions. But the County maintains some ability to use both the major league and minor league sites for civic-oriented events and for natural disaster purposes. In the MOU, the County and the Orioles also “acknowledge that it is mutually beneficial to facilitate the establishment of a youth baseball academy” at the minor league site.
 

 The Interlocal Agreement between the City and the County requires the City to transfer ownership of the Ed Smith Stadium complex to the County. It also requires the City to pay the environmental remediation costs associated with this facility. The City is further required to “use its best efforts to issue its bonds to be repaid by the OTTED funds ... in an amount estimated to be not less than $7.5 million.”
 

 The terms of the MOU and Interlocal Agreement were the result of extensive negotiations. In furtherance of the Board’s directive to begin negotiations with the Orioles, Bullock retained two consultants for their baseball expertise and also consulted with County staff, including the County’s chief financial officer, the County’s attorney, the County’s parks and recreation director, and a County planning coordinator. Bullock’s communications and discussions with these individuals were not advertised or otherwise treated as public meetings.
 

 The negotiations with the Orioles took place intermittently over a series of months through meetings, phone calls, and e-mailed documents involving different individuals, all coordinated by Bullock. Representatives of the Sarasota Chamber of Commerce became involved to advocate for an agreement with the Orioles, and the Chamber funded a study of the economic impact of spring training in Sarasota. The Orioles invoked the confidentiality provision of section 288.075, Florida Statutes (2009), to keep confidential its proprietary economic development information relating to the proposed transaction. These negotiations led to the July 22, 2009 presentation to the Board of the Interlocal Agreement and the MOU and several mechanisms to finance renovations to the stadium and other facilities.
 

 The negotiations with the Orioles took place alongside a series of discussions by the Board at its public meetings. For example, on November 4, 2008, the Board approved a motion directing staff to open negotiations using one-half percent of tourist development tax revenue and potential City contributions. On November 18, 2008, Bullock provided a status report of the meetings and discussed the location of
 
 *760
 
 a proposed new facility and the components of the new facility. County staff also presented information regarding capital costs, potential funding sources, and the economic impact of the proposed new facility. On November 18, the Board also discussed specific components of the potential deal, including operations and maintenance payments and a proposed Cal Rip-ken youth baseball academy. Then, on December 9, 2008, the Board discussed a proposal by one of the commissioners that involved $31.6 million financed with one-half percent of tourist development tax money to renovate the existing Ed Smith Stadium. On December 17, 2008, Bullock requested guidance from the Board on acceptable parameters for a proposal to retain Major League Baseball. Both County staff and Orioles representatives made presentations. Also on December 17, the Board discussed and rejected an Orioles’ proposal for a $58 million spring training facility to be funded by an additional one-quarter percent of tourist development tax money, but then approved a counteroffer involving a lower dollar figure. At public meetings on January 27, 2009 and February 11, 2009, the Board again discussed the Orioles negotiations. On March 17, 2009, the Board directed the County Administrator to send correspondence signed by the Board Chair to the Orioles requesting a written counteroffer.
 

 At various points after the start of negotiations with the Orioles in November 2008, e-mails from constituents or others to members of the Board regarding the Orioles were copied to other Board members and sometimes included the reactions from other Board members. In at least one e-mail correspondence, a comment was directly addressed from one Board member to another. The last e-mail among Board members produced at trial was sent on April 12, 2009.
 

 Thereafter, at its properly noticed public meeting on April 14, 2009, the Board discussed the Baltimore Orioles negotiations, including construction costs and potential funding, and one of the commissioners presented a detailed, draft counter-proposal term sheet outlining funding, terms of the lease, advertising, the youth facility, and an agreement with the City, among other issues. The Board rejected that commissioner’s proposal as well as another commissioner’s alternative proposal. At an April 21, 2009 meeting, the Board discussed the Orioles’ proposal and directed the County Administrator to send correspondence to the City asking for formal confirmation of the City’s willingness to issue bonds. At a May 13, 2009 meeting, the Board discussed the City’s resolution, and Bullock advised the Board on discussions with the Orioles. The Board discussed stadium costs and financing and then directed the County Administrator to proceed with negotiations providing funding in the amount of $28.2 million contingent upon specific terms relating to operations and maintenance, advertising, construction management, stadium uses, property taxes, terms of occupancy, and the Cal Ripken youth facility. Then, on May 26, 2009, the Board discussed the Orioles’ response as well as funding sources for the renovation of the stadium. One commissioner noted that she “could handle” another $3 million in addition to the prior $28.2 million offer. And members of the public, including a representative of Citizens, spoke regarding the proposed facilities.
 

 Ultimately, these negotiations and meetings resulted in Board action on July 22, 2009. On that date, the Board held a public hearing that lasted over four hours. The Board heard from approximately forty citizens, including several representatives of Citizens. Bullock and staff gave a presentation on the provisions of the proposed
 
 *761
 
 documents and answered questions posed by the Board.
 

 Then, on February 19, 2010, after Citizens filed a suit alleging Sunshine Law violations against the City and the County, the Board held another public hearing for the reconsideration and ratification of the Interlocal Agreement, the MOU, and related actions. The Board also adopted a new resolution authorizing the sale of bonds to finance the County’s portion of the facility renovations.
 

 Additionally, the County and the City filed separate complaints seeking validation of the bonds proposed for issuance in furtherance of the agreement with the Orioles. The County’s validation complaint related to County Resolution No. 2010-029, which was adopted on February 19, 2010 and which authorized three types of bonds: (1) Capital Improvement Revenue Bonds, Series 2010A (Federally Taxable-Build America Bonds-Direct Subsidy); (2) Capital Improvement Revenue Bonds, Series 2010B (Federally Taxable-Build America Bonds-Recovery Zone Economic Development Bonds-Direct Subsidy); and (3) Capital Improvement Revenue Bonds, Series 2010C. And the City’s validation complaint related to City Resolutions No. 10R-2185 and 10R-2139, which were adopted on November 2, 2009 and December 7, 2009 and which authorize Sales Tax Payments Revenue Bonds, Series 2010 (Federally Taxable-Build America Bonds-Recovery Zone Economic Development Bonds-Direct Subsidy). Citizens alleged Sunshine Law violations as objections to both of these bond validation actions.
 

 The trial court consolidated the bond validation proceedings and Citizens’ Sunshine Law complaint. After a four-day bench trial, the trial court validated the County’s and the City’s proposed bonds and denied Citizens’ complaint. On appeal in this Court, Citizens allege that the trial court erred in ruling that (a) Bullock’s consultations were not required to be in the sunshine, (b) the one-on-one staff briefings of County Board members prior to the July 22, 2009 public meeting were not a violation of the Sunshine Law, and (c) any e-mail violations were cured by the Board’s public, meetings.
 

 II. THE NEGOTIATIONS TEAM
 

 Citizens contend that the trial court erred when ruling that Bullock and the individuals he consulted in negotiating with the Orioles (the so-called negotiations team) were not a board or commission subject to the Sunshine Law. However, we agree with the City and County and affirm the trial court.
 

 At the outset, we note the following:
 

 [A] trial court must make three determinations during a bond validation proceeding: (1) whether the public body has the authority to issue the subject bonds; (2) whether the purpose of the obligation is legal; and (3) whether the authorization of the obligation complies with the requirements of law.
 
 City of Gainesville v. State,
 
 863 So.2d 138, 143 (Fla.2003). On appeal, this Court reviews the “trial court’s findings of fact for substantial competent evidence and its conclusions of law de novo.”
 
 Id.
 
 (citing
 
 City of Boca Raton v. State,
 
 595 So.2d 25, 31 (Fla.1992);
 
 Panama City Beach Cmty. Redev. Agency v. State,
 
 831 So.2d 662, 665 (Fla.2002)).
 

 Bay County v. Town of Cedar Grove,
 
 992 So.2d 164, 167 (Fla.2008). This appeal regarding alleged Sunshine Law violations only concerns the third item above, whether the authorization complies with the requirements of law.
 

 
 *762
 
 Article I, section 24(b) of the Florida Constitution provides:
 

 All meetings of any collegial public body of the executive branch of state government or of any collegial public body of a county, municipality, school district, or special district, at which official acts are to be taken or at which public business of such body is to be transacted or discussed, shall be open and noticed to the public and meetings of the legislature shall be open and noticed as provided in Article III, Section 4(e), except with respect to meetings exempted pursuant to this section or specifically closed by this Constitution.
 

 And section 286.011, Florida Statutes (2009), commonly known as the Government in the Sunshine Law, provides in part:
 

 All meetings of any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation, or political subdivision, except as otherwise provided in the Constitution, at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule, or formal action shall be considered binding except as taken or made at such meeting. The board or commission must provide reasonable notice of all such meetings.
 

 Because section 286.011 “was enacted in the public interest to protect the public from ‘closed door’ politics ... the law must be broadly construed to effect its remedial and protective purpose.”
 
 Wood v. Marston,
 
 442 So.2d 934, 938 (Fla.1983). As this Court has explained,
 

 [t]he statute should be construed so as to frustrate all evasive devices. This can be accomplished only by embracing the collective inquiry and discussion stages within the terms of the statute, as long as such inquiry and discussion is conducted by any committee or other authority appointed and established by a governmental agency, and relates to any matter on which foreseeable action will be taken.
 

 Town of Palm Beach v. Gradison,
 
 296 So.2d 473, 477 (Fla.1974). “Mere showing that the government in the sunshine law has been violated constitutes an irreparable public injury....”
 
 Id.
 
 Therefore, where officials have violated section 286.011, the official action is void ab initio.
 
 Id.
 

 All governmental authorities in Florida are subject to the requirements of the Sunshine Law unless specifically exempted.
 
 See
 
 art. I, § 24(c), Fla. Const. The requirements may also apply to committees subordinate to or selected by traditional governmental authorities. This Court in
 
 Wood
 
 explained that the disposi-tive question is whether “decision-making authority” has been delegated to the committee. 442 So.2d at 939. Where the committee has been delegated decision-making authority, the committee’s meetings must be open to public scrutiny, regardless of the review procedures eventually used by the traditional governmental body.
 
 See id.
 
 at 939-40 (“Where a body merely reviews decisions delegated to another entity, the potential for rubber-stamping always exists. To allow a review procedure to insulate the decision itself from public scrutiny invites circumvention of the Sunshine Law.”). In contrast, a committee is not subject to the Sunshine Law if the committee has only been delegated information-gathering or fact-finding authority and only conducts such activities.
 
 See id.
 
 at 940-41;
 
 see also Lyon v. Lake County,
 
 765 So.2d 785, 789 (Fla. 5th DCA 2000) (“When a committee has been established for and conducts only information gathering and reporting, the activities of that committee are not subject to section
 
 *763
 
 286.011, Florida Statutes.”). Whether, in fact, the delegation is a delegation of decision-making authority or fact-finding authority is evaluated according to the “nature of the act performed, not on the make-up of the committee or the proximity of the act to the final decision.”
 
 Wood,
 
 442 So.2d at 939 (emphasis omitted).
 

 In this case, the trial court’s order included factual findings regarding the roles of the individuals Bullock consulted when negotiating with the Orioles. Specifically, the trial court found that “the people and entities Bullock met with ... operated in the roles of advisor, consultant and facilitator to assist him in the performance of his duty to negotiate with the Orioles.” The trial court found that these individuals “did not deliberate with, or without, him.” “Bullock retained and exercised the ultimate authority to negotiate the terms of the MOU that would be submitted to the [Board] for consideration.”
 

 These factual findings are supported by competent substantial evidence in the record.
 
 See Lyon,
 
 765 So.2d at 790 (reviewing trial court’s factual finding that a meeting was informational for competent substantial evidence in the record). For example, Bullock testified that there was never a committee formed to negotiate any aspects of the MOU. Bullock also testified that he only consulted with the County’s chief financial planning officer for information regarding potential funding and financing mechanisms and that the County’s parks and recreation director “would provide information because this is essentially a recreational facility.” Additionally, the County’s project coordinator testified that she provided staff support by making copies, typing letters, and scheduling meeting rooms. There was also testimony from the County Administrator that the baseball experts’ responsibilities were “to advise staff as to the makeup of what should be [in] an MOU, the issues to be aware of[, and] to provide some comparative analysis of other such deals around the country.” And individual members of the so-called negotiating team testified that they were not delegated any authority to negotiate with the Orioles and that everything was under the direction of Bullock. Therefore, there is competent substantial evidence in the record to support the trial court’s findings that the individuals consulted by Bullock performed an informational and fact-finding role in assisting Bullock.
 

 Because the individuals consulted by Bullock served an informational role, the so-called negotiations team did not constitute an advisory committee subject to the requirements of the Sunshine Law. As explained above, only advisory committees acting pursuant to a delegation of decision-making authority by the governmental entity are subject to the open meetings requirement of section 286.011. Advisory committees functioning as fact-finders or information gatherers are not subject to section 286.011.
 
 See Lyon,
 
 765 So.2d at 789;
 
 Cape Publ’ns, Inc. v. City of Palm Bay,
 
 473 So.2d 222 (Fla. 5th DCA 1985);
 
 Bennett v. Warden,
 
 333 So.2d 97 (Fla. 2d DCA 1976). This is not a situation where Bullock and the individuals he consulted made joint decisions.
 
 Cf. Dascott v. Palm Beach County,
 
 877 So.2d 8 (Fla. 4th DCA 2004). Instead, these individuals were simply providing advice and information, which does not make the negotiations team a board or commission subject to the Sunshine Law.
 
 See, e.g., McDougall v. Culver,
 
 3 So.3d 391, 393 (Fla. 2d DCA 2009) (“[T]he senior officials provided only a recommendation to the Sheriff but they did not deliberate with him nor did they have decision-making authority. Therefore, we conclude that the use of the memoranda did not violate the Sunshine Law.”);
 
 Jordan v. Jenne,
 
 938 So.2d 526, 530 (Fla. 4th
 
 *764
 
 DCA 2006) (“Because the [group] provided only a mere recommendation to the inspector general and did not deliberate with the inspector general, the ultimate authority on termination, we conclude that the [group] does not exercise decision-making authority so as to constitute a ‘board’ or ‘commission’ within the meaning of section 286.011, and as a result, its meetings are not subject to the Sunshine Act.”).
 

 Citizens argue that the statutes regarding economic development agencies should alter this analysis. Citizens specifically point to section 288.075(2)(a), Florida Statutes (2009), which provides:
 

 Upon written request from a private corporation, partnership, or person, information held by an economic development agency concerning plans, intentions, or interests of such private corporation, partnership, or person to locate, relocate, or expand any of its business activities in this state is confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution for 12 months after the date an economic development agency receives a' request for confidentiality or until the information is otherwise disclosed, whichever occurs first.
 

 The County acknowledges that Bullock was acting as an economic development agency and that the Orioles’ proprietary information was not released pursuant to section 119.07(1), Florida Statutes (2009), of the Public Records Act after the Orioles invoked the exemption outlined in section 288.075(2)(a). However, this does not mean Bullock and the individuals he consulted were a board or commission within the meaning of section 286.011 of the Sunshine Law. If an individual is not already a member of a board or commission governed by the Sunshine Law, nothing about working on economic development projects or receiving proprietary information converts him or her into one.
 

 Accordingly, this Court affirms the trial court’s ruling regarding Bullock and the individuals he consulted while negotiating with the Orioles.
 

 III. ONE-ON-ONE BRIEFINGS
 

 Citizens next argue that the trial court erred in determining that the private staff briefings of individual board members in preparation for the July 22, 2009 public hearing did not violate the Sunshine Law. We agree with the contrary arguments of the City and County and affirm the trial court.
 

 This Court has explained that meetings within the meaning of the Sunshine Law include any gathering, formal or informal, of two or more members of the same board or commission “where the members deal with some matter on which foreseeable action will be taken by the Board.”
 
 Tolar v. School Bd. of Liberty County,
 
 398 So.2d 427, 428 (Fla.1981);
 
 see also Bd. of Pub. Instruction v. Doran,
 
 224 So.2d 693, 698 (Fla.1969). However, public officials may call upon staff members for factual information and advice without being subject to the Sunshine Law’s requirements.
 
 See Occidental Chem. Co. v. Mayo,
 
 351 So.2d 336, 342 (Fla.1977);
 
 Wood,
 
 442 So.2d at 940 (“The Second District found no violation, holding,
 
 inter alia,
 
 that the meetings were not decision-making in nature, but were ‘for the purpose of “fact-finding” to assist him in the execution of [his] duties,’
 
 [Bennett,]
 
 333 So.2d at 99, and we approve the holding that such fact-finding staff consultations are not subject to the Sunshine Law.”).
 

 Here, Bullock, individually and assisted by other County staff, held one-on-one meetings in the two- or three-day period immediately preceding the Board’s public
 
 *765
 
 meeting on July 22, 2009. These meetings were informational briefings regarding the contents of the MOU, where Bullock would also ask if the individual members had any questions about the MOU. There is no evidence that Bullock or other County staff communicated what any commissioner said to any other commissioner.
 

 These informational briefings for individual members of the Board were not violations of the Sunshine Law. As this Court has explained,
 

 members of a collegial administrative body are not obliged to avoid their staff during the evaluation and consideration stages of their deliberations. Were this so, the value of staff expertise would be lost and the intelligent use of employees would be crippled.
 

 Occidental,
 
 351 So.2d at 342 n. 10. Therefore, we affirm the trial court’s ruling regarding these one-on-one meetings.
 

 IV. E-MAILS
 

 Lastly, Citizens contend that the trial court erred by ruling that any violations committed in e-mail discussions between board members were cured by the Board’s public meetings that were held up to and including July 22, 2009. Agreeing with the contrary arguments of the City and County, we affirm the trial court.
 

 In
 
 Tolar,
 
 398 So.2d at 429, this Court held that Sunshine Law violations can be cured by “independent, final action in the sunshine,” which this Court distinguished from mere ceremonial acceptance or perfunctory ratification of secret actions and decisions.
 
 See also Zorc v. City of Vero Beach,
 
 722 So.2d 891, 903 (Fla. 4th DCA 1998) (“[OJnly a
 
 full,
 
 open hearing will cure a defect arising from a Sunshine Law violation. Such violation will not be cured by a perfunctory ratification of the action taken outside of the sunshine.”);
 
 Monroe County v. Pigeon Key Historical Park, Inc.,
 
 647 So.2d 857, 861 (Fla. 3d DCA 1994) (“Governmental actions will not be voided whenever governmental bodies have met in secret where sufficiently corrective final action has been taken.”).
 

 In
 
 Tolar,
 
 a school superintendent-elect met privately with school board members and discussed, among other things, the removal of Tolar as director of administration and abolition of his position. 398 So.2d at 427. At a subsequent public meeting in which Tolar was present and “given full opportunity to express his views,” the school board members voted to transfer Tolar to another position and abolish his position.
 
 Id.
 
 Tolar sued for injunctive relief, alleging a violation of section 286.011.
 
 Id.
 
 As this Court noted, “By the express terms of section 286.011, any resolution, rule, regulation, or formal action taken at these secret meetings would not be binding.”
 
 Id.
 
 at 428. Yet this Court declined to invalidate the action taken by the school board.
 
 Id.
 
 Instead, this Court distinguished
 
 Tolar
 
 from its previous holding in
 
 Gradison,
 
 296 So.2d 473, where this Court held void formal action that “was merely the crystallization of secret decisions.”
 
 Tolar,
 
 398 So.2d at 428.
 

 As explained in
 
 Tolar,
 
 the
 
 Gradison
 
 holding invalidating what was merely a summary approval of secret decisions
 

 does not mean, however, that public final action of the Board will always be void and incurable merely because the topic of the final public action was previously discussed at a private meeting....
 

 [[Image here]]
 

 ... [H]ere[,] the Board took independent, final action in the sunshine in voting to abolish the position. The Board’s action was not merely a ceremonial acceptance of secret actions and was not merely a perfunctory ratification of se
 
 *766
 
 cret decisions at a later meeting open to the public.
 

 398 So.2d at 428-429.
 

 In this case, e-mails from constituents to members of the Board were copied to other members and sometimes led to comments between Board members regarding the topic of bringing the Orioles to Sarasota for spring training. The last such email exchange, which possibly violated the Sunshine Law, occurred on April 12, 2009. However, the Board conducted multiple public meetings subsequent to that April 12 exchange where the topic of Orioles spring training was discussed and considered. For example, on April 14, 2009, the Board publicly rejected a commissioner’s detailed proposal for an agreement with the Orioles as well as another commissioner’s alternative proposal. Then, on May 13, 2009, the Board publicly discussed stadium costs and financing and directed the County Administrator to proceed with negotiations providing funding in the amount of $28.2 million contingent upon specific terms relating to operations and maintenance, advertising, construction management, stadium uses, property taxes, terms of occupancy, and the Cal Ripken youth facility. Then, on May 26, 2009, the Board considered the Orioles’ response as well as funding sources for the renovation of the stadium. One commissioner noted that she “could handle” another $3 million in addition to the prior $28.2 million offer. Ultimately, on July 22, 2009, the Board held a properly noticed public hearing and approved the MOU and the Interlocal Agreement after a multi-hour discussion. In fact, representatives of Citizens spoke at that July 22 hearing as well as the prior meeting on May 26.
 

 Based upon the fact that, subsequent to the last possibly violative e-mail, multiple proposals were discussed and rejected before one was finally approved, it is clear the Board took independent, final action in the sunshine regarding Orioles spring training in Sarasota. This simply is not the case of a “ceremonial acceptance of secret actions [or] merely a perfunctory ratification of secret decisions at a later meeting open to the public.”
 
 Tolar,
 
 398 So.2d at 429. Therefore, any possible email violations were cured.
 

 CONCLUSION
 

 We affirm the trial court’s judgment validating bonds proposed for issuance by the City of Sarasota and the County of Sarasota in furtherance of the agreement bringing the Baltimore Orioles to Sarasota for spring training. Because Bullock’s so-called negotiations team only served an informational role, it was not subject to the requirements of the Sunshine Law. The County also did not violate the Sunshine Law when Bullock, assisted by other County staff, briefed individual Board members prior to the July 22, 2009 public meeting. Finally, any possible violations that occurred when Board members circulated e-mails among each other were cured by subsequent public meetings regarding the negotiations and agreement with Orioles.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . We have jurisdiction.
 
 See
 
 art. V, § 3(b)(2), Fla. Const.;
 
 see also Rowe v. Pinellas Sports Auth.,
 
 461 So.2d 72, 74 (Fla.1984).