DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**DAMIEN HERMAN GILLIAMS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D21-2667

[April 12, 2023]

Appeal from the County Court for the Nineteenth Judicial Circuit, Indian River County; Michael Linn, Judge; L.T. Case No. 312020MM001119A.

Ama N. Appiah of the Law Office of Ama N. Appiah, P.A., St. Petersburg, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Lindsay A. Warner, Assistant Attorney General, West Palm Beach, for appellee.

PER CURIAM.

After the City of Sebastian's city manager announced a cancellation of a properly noticed city council meeting, three councilmembers, including the appellant, Damien Gilliams, held a meeting anyway, during which they voted to terminate the employment of the city manager, the city attorney, and the city clerk, and voted to remove the mayor and replace him with Gilliams. Based on this meeting and telephone calls between Gilliams and Sebastian City Councilmembers Pamela Parris and Charles Mauti before and after the meeting, Gilliams was convicted of three counts of violating section 286.011, Florida Statutes (2019), commonly referred to as the Sunshine Law. He was also convicted of perjury based on a statement he made to state attorney investigators Ed Arens and Jeff Kittredge during an investigation of the Sunshine Law violation. Gilliams raises multiple issues on appeal. We agree with Gilliams that his perjury conviction should be reversed, as the state did not prove he made the false statement alleged. We affirm with respect to the remaining issues, because they lack merit or were not preserved.

Gilliams first challenges his Sunshine Law convictions, arguing that the statute is unconstitutionally vague due to undefined terms in the statute, namely "meeting" and "reasonable notice."[1] We disagree. "There is a strong presumption that a statute is constitutionally valid, and all reasonable doubts about the statute's validity must be resolved in favor of constitutionality." *State v. Catalano*, 104 So. 3d 1069, 1075 (Fla. 2012). However, "in a vagueness challenge, any doubt as to a statute's validity should be resolved in favor of the citizen and against the State." *Id.* (quoting *DuFresne v. State*, 826 So. 2d 272, 274 (Fla. 2002)). "One who challenges the constitutionality of a statute has the burden of demonstrating its invalidity." *Dep't of Child. & Fam. Servs. v. Nat. Parents of J.B.*, 736 So. 2d 111, 113 (Fla. 4th DCA 1999) (citation omitted). As we explained in our opinion in Gilliams's co-defendant's appeal, where we also addressed a vagueness challenge:

> "[I]n order to withstand a vagueness challenge, a statute must provide persons of common intelligence and understanding adequate notice of the proscribed conduct. Additionally, the statute must define the offense in a manner that does not encourage arbitrary and discriminatory enforcement." *DuFresne v. State*, 826 So. 2d 272, 275 (Fla. 2002) (citations omitted). "However, '[t]he legislature's failure to define a statutory term does not in and of itself render a penal provision unconstitutionally vague. In the absence of a statutory definition, resort may be had to case law or related statutory provisions which define the term . . . .'" *Id.* (alterations in original) (quoting *State v. Hagan*, 387 So. 2d 943, 945 (Fla. 1980)). "[I]n cases where the exact meaning of a term was not defined in a statute itself, we have ascertained its meaning by reference to other statutory provisions, as well as case law or the plain and ordinary meaning of a word of common usage." *Id.*

*Parris v. State*, 4D21-2682 (Fla. 4th DCA Apr. 12, 2023).

In *Parris*, we explained that the plain and ordinary meaning of the words "reasonable" and "notice," as well as court opinions addressing the meaning of "reasonable notice," provide sufficient guidance as to the

---

[1] Gilliams points to other undefined words and phrases in the statute, but he either provides no argument or undeveloped argument as to those terms, or his argument was not preserved below.

phrase's meaning in the context of the Sunshine Law. *Id.*; *see also Transparency for Fla. v. City of Port St. Lucie*, 240 So. 3d 780, 787 (Fla. 4th DCA 2018) (holding that what constitutes "reasonable notice" in any given case is a fact specific inquiry, and whether notice was reasonable depends on the purpose for the notice, the character of the event about which notice is given, and the nature of the rights to be affected); *Fla. Citizens All., Inc. v. Sch. Bd. of Collier Cnty.*, 328 So. 3d 22, 28 (Fla. 2d DCA 2021) (citing *Transparency for Fla.* and holding that "burying a notice inside a committee application and calendar on the instructional materials page of the District's website is an unreasonable way to give public notice of a meeting").

As for the word "meeting," Gilliams argues that the definition provided to the jury, which includes the language "through wire or electronic means," is inconsistent with the dictionary definition of "meeting" and is also contrary to the definition of the word at the time of the statute's enactment. Thus, he argues, a telephone conversation should not be considered a "meeting."

"Meeting" is defined as "an organized gathering of people for a discussion or other purpose . . . a situation in which people meet by chance or arrangement." *Oxford Am. Dictionary & Thesaurus* (2d ed. 2009). Our courts have recognized that meetings which do not occur in person can potentially violate the Sunshine Law. *See Transparency for Fla.*, 240 So. 3d at 785 (recognizing that a series of phone meetings between councilmembers and city attorney could have violated the Sunshine Law); *Sarasota Citizens for Responsible Gov't v. City of Sarasota*, 48 So. 3d 755, 766 (Fla. 2010) ("[A]ny possible violations that occurred when Board members circulated e-mails among each other were cured by subsequent public meetings . . . ."). These interpretations of the statute are consistent with its plain language. *See* Robert Michael Eschenfelder, *Modern Sunshine: Attending Public Meetings in the Digital Age*, 84 Fla. B.J. 28, 28 (Apr. 2010) ("Given the lack of any constitutional or statutory definition of the word 'meeting,' coupled with the ability of modern technology to allow meetings to be attended by persons physically located in different countries, a plain language reading of the word would seem to allow meetings subject to the Sunshine Law to be conducted and attended electronically.").[2] To interpret the statute as applying only to in-person meetings would render an absurd result.

---

[2] Notably, the Government-in-the-Sunshine Manual, published by the Attorney General to help public officials navigate the Sunshine Law, provides an accurate explanation of the law in that "[p]rivate telephone conversations between board members to discuss matters which foreseeably will come before that board for

*Perjury Conviction*

Gilliams next argues that the trial court erred in denying his motion for judgment of acquittal as to the perjury count. We agree. The state alleged that Gilliams "falsely told a law enforcement officer that he had only one phone conversation with another council member on April 22, 2020 . . . ." However, the state failed to prove: (1) Gilliams actually stated that he had only one phone conversation with another councilmember on the date in question; and (2) Gilliams had more than one phone conversation with a councilmember during the period of time about which he was interrogated.

At trial, the state submitted a surveillance video and photographic stills showing Gilliams entering city hall at 5:30 p.m. on April 22, 2020, and speaking on a cell phone. The state also introduced into evidence an investigator's summary, which reflected that calls were made from Gilliams's cell phone to Parris's cell phone throughout the day starting in the morning and continuing into the afternoon and evening, and that calls were also made that day between Gilliams and Mauti.

The state also submitted as evidence Gilliams's recorded statement to investigators Arens and Kittredge. During questioning, Gilliams explained that one of his supporters, Russell Herrmann, called him on April 22 and asked if he was "coming down" to city hall. Gilliams responded that the meeting had been canceled. Herrmann encouraged him to go to city hall, as "your supporters are all down here and they want to have a rally." Gilliams dressed quickly and "brought my bullhorn." Upon his arrival, he met up with councilman Mauti. He believed Herrmann had called Parris to tell her about the rally.

Arens inquired whether Gilliams had asked Herrmann to contact Parris to tell her "we're having a meeting," and Gilliams responded, "No. I was there for a rally." Gilliams acknowledged that in the surveillance video, he can be seen talking on the phone. Arens stated that it "looked [like] . . . you made some phone calls." Gilliams responded, "I made one phone call." When asked who he called, he declined to say. The following exchange occurred:

> Q: Did you call Councilman Parris?
>
> A: No.

---

action violate the Sunshine Law." 44 Government-in-the-Sunshine Manual § 1.C.16.a. (2022 ed.).

Q:     Did you text or contact Councilman Parris . . . in any way?

A:     I, I told you earlier, when I got there –

Q:     Right.

A:     -- that was the only time that I had called her, about the rally.  I told you that . . . just a few minutes ago.

Q:     No, you didn't say that you called her.  You said Mr. Herrmann called her.

A:     No, and I also called her as well.

Q:     Okay.  I missed that.

A:     Yeah.  I'm . . . sorry . . . I also asked her, I said, "Are you coming down to the rally, I'm down here."  She says, she wasn't sure.  I said, "So, okay, I'm going to be down here."

       . . . .

Q:     Anyway, so you did call Councilman Parris and asked her if she was –

A:     About the rally.

Q:     About coming to the rally.

A:     Correct.

The investigative interview moved on to other topics.  Investigator Kittredge then asked if, after Gilliams "decided to show up or go" to city hall, "[d]id you have any communication with Parris or Mauti via phone text?"  Gilliams stated, "I think I called [Parris], not text."  He denied any "texting."  He called Parris to ask if she was going to come to the rally.  After Kittredge questioned Gilliams about details regarding the meeting held on April 22, Arens returned to the topic of "who [Gilliams] called," as depicted on surveillance video.  Gilliams said he "called [his] attorney."

Gilliams moved for a judgment of acquittal on the perjury charge, arguing that the investigators' questions were not sufficiently specific to support a finding that Gilliams made the perjurious statement alleged in the information. The trial court denied the motion.

We review a trial court's denial of a motion for judgment of acquittal de novo. *McCray v. State*, 256 So. 3d 878, 881 (Fla. 4th DCA 2018). Gilliams was convicted of perjury under section 837.012, Florida Statutes (2019), which provides that "[w]hoever makes a false statement, which he or she does not believe to be true, under oath, not in an official proceeding, in regard to any material matter shall be guilty of a misdemeanor of the first degree." § 837.012(1), Fla. Stat. (2019). "The statement alleged to be perjury must be one of fact, and not of opinion or belief." *Vargas v. State*, 795 So. 2d 270, 272 (Fla. 3d DCA 2001). "The questions posed to elicit perjured testimony must be asked with the appropriate specificity necessary to result in an equally specific statement of fact." *Cohen v. State*, 985 So. 2d 1207, 1209 (Fla. 3d DCA 2008). "Precise questioning is imperative as a predicate for the offense of perjury." *Id.* (quoting *Bronston v. United States*, 409 U.S. 352, 362 (1973)). "[A]n initially false statement . . . can be further explained so that the statement taken as a whole is not perjury." *McAlpin v. Crim. Just. Stds. & Training Comm'n*, 155 So. 3d 416, 421 (Fla. 1st DCA 2014).

Here, the state alleged that Gilliams falsely stated that "he had only one phone conversation with another council member on April 22, 2020." Thus, the state's theory seemed to be that Gilliams either spoke to Parris more than once or he spoke to Parris and another councilmember. The investigators' questioning regarding the phone calls that resulted in the purported perjury was related to calls made after Gilliams arrived at city hall, at about 5:30 p.m. Arens stated during the interview that it appeared on the video Gilliams was making phone calls. Gilliams responded that he made "one phone call."

To the extent Gilliams lied about the number of phone calls which he made to Parris, that was not the state's allegation. The phone records summary shows that for the relevant time period, one call from Gilliams to Parris was made at 5:32 p.m. and lasted 1 minute and 34 seconds. A second phone call from Gilliams to Parris was made at 5:34 p.m. and lasted for 11 seconds. There was no evidence that the 11-second call constituted a "conversation." Arens acknowledged during cross-examination that many of the calls on the summary lasted only seconds, and he could not say whether anyone answered phone calls. He explained that the calls indicated "that person was trying to get ahold of the other person and they tried diligently to do so, multiple times before they

6

answered." He assumed longer calls on the summary constituted conversations. Investigator Arens agreed that shorter calls "might simply represent a no answer or some kind of voice mail or I'm not available." Further, even on longer calls, Arens could only say that "one phone connected with another phone number at that particular time." The phone records summary also reflects a phone call from Mauti to Gilliams at 5:31 p.m. that lasted 35 seconds. Again, it's not apparent a "conversation" occurred. Consequently, it's not apparent that Gilliams falsely stated "he had only one phone conversation with another council member." The phone records summary shows other calls between Gilliams and the other councilmembers on April 22, but the investigators' questions were related to the period of time when Gilliams can be seen on his phone in the video – around 5:30 p.m.

Finally, Gilliams argues that the issue of materiality of the statements underlying the perjury charge should have been submitted to a jury. The Florida Supreme Court rejected this argument. *See State v. Ellis*, 723 So. 2d 187, 188 (Fla. 1998). Although *Ellis* involved a different perjury statute than the one at issue here, both statutes "limit[] the statute's sweep to those false statements that concern 'material matters.'" *See id.* at 189; §§ 837.02(1), Fla. Stat. (1993), 837.012(1), Fla. Stat. (2019). And, as in *Ellis*, the applicable statute here provides that the issue of materiality is a question of law. § 837.011(3), Fla. Stat. (2019) (defining "[m]aterial matter" and providing that "[w]hether a matter is material in a given factual situation is a question of law").

Gilliams contends *Ellis* is no longer good law in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), where the United States Supreme Court held that a factual determination that allows for an increase in the maximum prison sentence must be made by a jury. *Id.* at 490. This argument lacks merit, as materiality is not a factual determination under chapter 837. Indeed, after *Apprendi* issued, the Third District cited *Ellis* for the proposition that materiality "is not an element of the crime of perjury in Florida but is a threshold issue that a court must determine as a matter of law prior to trial." *Vargas*, 795 So. 2d at 272.

*Conclusion*

Based on the foregoing, we affirm Gilliams's conviction of counts I-III, violations of the Sunshine Law, and we reverse his conviction of count IV, perjury, and remand for the trial court to vacate the conviction and sentence on that count.

*Affirmed in part, reversed in part, and remanded with instructions.*

KLINGENSMITH, C.J., and WARNER, J., concur.
CIKLIN, J., concurs specially with opinion.

CIKLIN, J., concurring specially.

The majority opinion solidly stands for the "clinical" legal reasoning and academic analysis behind our decision to both affirm and reverse certain of the convictions that occurred before a jury below.

I think it is important, however, to issue a clarion call to the hundreds of Florida public officials who are subject to the Florida Sunshine Law. Indeed, as more and more individuals become Floridians and engage in civic involvement, our new citizens need to be fully aware of Florida's Sunshine Law.[3] The appellate briefs filed in this case suggesting that the Sunshine Law is vague and unclear or that the law is weak and unprovable have given me pause and a commensurate urge to raise a warning flag. It has been many years since a comprehensive opinion has been issued by a Florida intermediate appellate court on the subject and, thus, perhaps this admonition is particularly timely.

It seems unlikely, in this unfortunate series of events, that former Sebastian City Councilmembers Pamela Parris and Damien Gilliams would have ever thought it imaginable that they would now be appealing criminal convictions for which they have been sentenced to serve jail time of two months and six months, respectively. My guess is, that in retrospect, they would have run away and resisted any temptation to get caught up in the excitement of the moment . . . as, unfortunately, they ultimately did. These recent Indian River County Sunshine Law prosecutions and convictions illustrate actual examples of popularly elected local governing body officials being ordered to do real jail time in a real Florida county jail for the commission of a real Florida crime. Of course, whether elected or appointed is of no consequence. The Florida Sunshine Law applies equally to all.

After now engaging in significant research on the law itself, plus sitting for oral argument on the topic in January, I have developed a concern that some government officials subject to the Sunshine Law may not fully appreciate the Law's meaning and/or the possible criminal penalties that

---

[3] The Sunshine Law applies to "any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation or political subdivision." § 286.011(1), Fla. Stat. (2019).

8

lie in wait for those who carelessly fail to fully comprehend the Sunshine Law and abide by it. And this baffling complacency is not for want of official publications—including the current 360-page Government-In-The-Sunshine manual prepared by the Florida Attorney General. 44 Government-in-the-Sunshine Manual (2022 ed.). To be sure, the briefings in these consolidated cases, and our majority opinion are considerably lengthy because the issues are complex and yet, paradoxically, not all that difficult to understand.

The scenario in this case is alarming. Three duly elected members of the Sebastian City Council who were not allowed to privately discuss foreseeable government issues did so anyway. They decided amongst themselves—as their personal protest to the mayor and city manager's decision to cancel a regularly scheduled city council meeting because of Covid—to enter the city council chambers and conduct the cancelled meeting anyway. Armed with a government-issued pass key, and in unlit city council chambers, these three city councilmembers took to the dais and purported to take official action at what in essence became a spontaneous, non-announced meeting of the three of them that lasted until the police showed up. That imprudent action was itself a flagrant violation of the Sunshine Law and a reading of the statute makes this conclusion abundantly clear.

Whether two or more officials privately discuss, in any manner whatsoever, a foreseeable issue of any magnitude, inside the other's office or at a coffee shop or in the spectator audience of a child's soccer match or at a statewide education conference or by quick text or whether they do so through surrogates (such as aides, friends, relatives, other government officials) or whether, as in this case, they decide to spontaneously convene an unannounced rally or meeting, so long as two or more are involved, these are all distinctions without a difference. And every individual unauthorized private discussion between two or more officials along the way constitutes an individual statutory crime against each person with each separate charge carrying a possible penalty of 60 days in the county jail. Plus a $500 fine. Plus substantial court costs. Plus six months of probation. Per act. And notably, in the State of Florida, no statutory sentencing guidelines exist for these types of crimes, and consecutive jail sentences and consecutive probationary periods are permitted and within the unfettered discretion of the trial judge.

Even though ample publications, and just as many available seminars, meetings, discussions, and groups, are specifically charged with fully educating officials subject to the Sunshine Law (which, ironically all three

9

charged city councilmembers attended), here are my very easy takeaways from the current state of the Florida Sunshine Law.

1. Meetings of two or more fellow government officials who are subject to the Sunshine Law are not allowed if any words of any type pertaining to any possible foreseeable issue will be communicated in any way unless they are open to the public to whom reasonable notice has been provided.

2. There is rarely any purpose for a private meeting or communication between two or more government officials who are both subject to the Sunshine Law. Those who engage in such activity widely open themselves to allegations that some aspect of the governmental decisional process has unlawfully occurred behind closed doors. Any aspect of the decisional process—ranging from whether to conduct a meeting in the first instance to the concept of terminating administrative staff to the seemingly inane decision as to which government officials will even make a motion to begin open public discussion—is part of the official decisional process and must be wide-open and advertised in advance to the public.

3. Under Florida law, there is no such thing as an "informal" conference or "unofficial" caucus or pass-you-in-the-hallway information gathering (or sharing) by two or more government officials subject to the Sunshine Law which would thereby remove such communication from the Sunshine Law's ambit. Indeed, such "innocuous" meetings have been held to be illegal and nothing short of the unlawful crystallization of secret decisions to a point just short of public discussion and ceremonial acceptance. And whether done personally or through surrogates (such as aide-to-aide), such meetings are illegal under Florida's Sunshine Law.

4. Any attempt to distinguish between a "formal," "informal," "ministerial," "informational gathering-only," or "just a listening" meeting between two or more government officials— for purposes of determining whether the Sunshine Law applies—is by itself alien to the law's design, exposing it to the very evasions which it was designed to prevent.

5. Because a violation of Florida's Sunshine Law can be investigated and charged as a crime, all of those law enforcement and prosecutorial techniques, such as the

issuance of subpoenas for cell phone records is but a signature away.  In these cases, prosecutors easily gathered data and produced it for the jury showing numerous texts, emails, telephone conversations, and voicemails over a wide-ranging period between all three city councilmembers.  The flow chart prepared by the prosecution and shown to the jury highlighted the dates of the calls, to whom they were made, the duration of the calls, and the overall sequence of communications.

6. When in any doubt as to whether a meeting or communication, either directly or indirectly between two or more government officials may be illegal under the Sunshine Law, the easy answer is:  "LEAVE." *See City of Miami v. Berns*, 245 So. 2d 38, 41 (Fla. 1971) ("The evil of closed door operation of government without permitting public scrutiny and participation is what the law seeks to prohibit.  If a public official is unable to know whether by any convening of two or more officials he is violating the law, he should leave the meeting forthwith.").

7.  Lying, under oath, about any matter that is material to an alleged Sunshine Law violation is considered as an additional crime of perjury and every individual lie constitutes an individual statutory crime against each person with each separate charge carrying a possible penalty of 1 year in the county jail.  Plus a $1000 fine.  Plus substantial court costs.  Plus 12 months of probation.  Per lie.  And just as is the case with the underlying Sunshine Law crime, no statutory sentencing guidelines exist for this type of crime in Florida, and thus consecutive jail sentences and consecutive probationary periods are permitted and within the trial judge's unfettered discretion.

*         *         *

***Not final until disposition of timely filed motion for rehearing.***

11