DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**FLORIDA CITIZENS' ALLIANCE, INC.,**
Appellant,

v.

**SCHOOL BOARD OF INDIAN RIVER COUNTY,**
Appellee.

No. 4D2023-2753

[December 18, 2024]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Indian River County; Janet C. Croom, Judge; L.T. Case No. 312022CA000970.

Brantley Oakey of The Law Office of Brantley Oakey, Naples, for appellant.

Jeffrey D. Slanker, Mitchell J. Herring, and Matthew J. Carson of Sniffen & Spellman, P.A., Tallahassee, for appellee.

KUNTZ, J.

Florida Citizens' Alliance, Inc. appeals the circuit court's summary judgment order on its Sunshine Law claims in favor of the School Board of Indian River County. FLCA alleged the School Board committed two separate Sunshine Law violations: one in 2016-17 regarding the adoption of social studies textbooks, and one in 2021-22 regarding the review of certain library books. The circuit court entered judgment for the School Board on both claims. We agree with FLCA that the School Board's textbook committee was subject to the Sunshine Law and reverse on that claim. But we disagree that the School Board's library committee was subject to the Sunshine Law and affirm on that claim.

**Background**

This appeal involves two separate but related issues. First, the School Board's creation of a committee to adopt social studies textbooks. Second, the School Board's creation of a committee to review library books.

### i. The textbook committee

The School Board had a Procedure for Instructional Materials Adoption, in accordance with "School Board Policy 2520." The Procedure instructs the Directors of Secondary and Elementary Education to create an Instructional Materials Committee to facilitate review of the proposed textbooks at each School Board school site. The teachers at those schools evaluate the textbooks using the School Board's rubric. Using the data from the rubric scores, the committee recommends to the Superintendent which materials to adopt for each class and grade. The Superintendent, in turn, presents the recommendation to the School Board at a duly noticed meeting for a vote. The School Board also created an "Adoption Timeline" to establish dates for completion of the process.

As the School Board directed, the secondary education director and the elementary education director created the textbook committee with volunteers and coordinated and participated in meetings. The textbook committee met for the first time on October 11, 2016, to review the adoption timeline, establish operating procedures, and select textbook committee chairpersons. The School Board posted on social media and advertised on local radio seeking additional volunteers for the textbook committee. But the elementary education director, who authored the posts, testified that the posts were solely to solicit volunteers and were not intended to provide notice of a public meeting.

The textbook committee met again on November 9, 2016, to hear presentations from textbook publishers. The presentation was split; elementary and secondary school publishers separately presented at the same time to the respective volunteers.

The next week, the School Board issued a press release for a textbook extravaganza. At the textbook extravaganza, the textbook publishers made all textbooks under consideration available for public review, and the public could ask questions of the publishers. The School Board's press release was sent to School Board members, principals, and news agencies, and stated:

> After the Textbook Extravaganza, school district staff will make recommendations on December 16. At that point, there will be a 20-day review period when parents, teachers, and the community can make suggestions based on what they viewed during the Textbook Extravaganza.

From November 28 to December 14, 2016, the textbook committee facilitated a review of textbooks by other teachers. These meetings at the schools were not noticed, and no minutes were taken. Additionally, on December 8, the School Board posted invitations to "participate in review process" on Facebook and Twitter. The posts included hyperlinks, but the links were broken at the time this case commenced. The School Board's corporate representative testified that the links would have led to a "survey collection instrument," where the public could provide "feedback on the social studies adoption."

Other than the solicitations for volunteers, the Textbook Extravaganza press release, and (potentially) these social media posts, it does not appear the School Board posted other notices for any textbook committee meeting.

The textbook committee met on December 16 to analyze the teachers' rubric submissions and determine which textbooks to recommend to the Superintendent. The textbook committee thereafter submitted its recommended textbooks to the Superintendent.

No members of the public, other than textbook committee members, attended or requested access to the textbook committee meetings. The textbook committee made the recommended materials available to the public from January 9 to February 6, 2017, but it received no comments.

Handwritten minutes of the textbook committee meetings were allegedly created. But the minutes were not retained or posted for public access. Instead, the minutes were allegedly incorporated into a PowerPoint presentation which was presented at the Superintendent's Workshop on February 28, 2017.

The School Board issued a public notice of that workshop on January 27, 2017. The notice was reissued when the date of the meeting changed. At the workshop, the School Board examined the entirety of the selection process, reviewed the PowerPoint, and had an opportunity to ask questions. And at the School Board business meeting, the School Board again discussed the textbook selections, which the Superintendent had recommended. The School Board solicited public comment, but no requests to speak or written responses were submitted. After additional School Board discussion, the School Board approved the recommended materials in a 3-2 vote.

After this approval, the public again had a chance to review the materials and contest their adoption, from February 29 to April 18, 2017. No member of the public submitted any petitions. The School Board

unanimously approved the purchase of the textbooks at a public meeting on April 25, 2017.

### ii.    The library committee

In October 2021, a petitioner protested certain material found within schools. The School Board ordered its Superintendent to review the books subject to protest and provide a recommendation as to the appropriateness of each one. The Assistant Superintendent, in turn, convened a library committee to review the books and provide recommendations. The library committee was comprised entirely of "District Media Specialists" (librarians) and staff from the Office of Curriculum and Instruction because they held "appropriate certifications to review the challenged material at hand." No parents or community members were included on the library committee.

The library committee reviewed the books to determine whether they violated Florida's pornography statutes and had "serious literary merit." The library committee then categorized the reviewed books as appropriate for elementary, middle, high school, high school with restrictions, or inappropriate for school libraries.

The library committee met five times: on December 7, 2021; January 4, 2022; February 8, 2022; February 15, 2022; and February 23, 2022. At the first meeting on December 7, the library committee reviewed relevant laws, regulations, and policies about removing books from libraries, and discussed if and how these authorities would impact the challenged materials. To aid in reviewing the substantial number of challenged books, the committee was divided into four sub-committees and each would review a portion of the titles.

After completing the review, the library committee officially submitted its recommendations to the Superintendent regarding 148 of the 156 challenged books. The remaining eight books were either unavailable or not timely received by the library committee for review. The library committee did not find that any book was "pornographic," but did recommend: (1) removing five books from all libraries; (2) requiring parental consent for high school students to read four books; (3) restricting twenty-five other titles to the high school level; and (4) keeping 114 books at their original level. The library committee did not eliminate any challenged book from review or consideration by either the Superintendent or the School Board.

The Superintendent presented the library committee's recommendations to the School Board at its meeting on February 28, 2022. This meeting was publicly noticed on February 4, 2022. At this meeting, three members of the public spoke regarding the books. During the School Board's public discussions, one School Board member expressed disapproval of the matter and moved to table it, but the motion did not receive a "second." The other School Board members spoke, supporting the Superintendent's recommendation; one stated she had reviewed the recommendations "carefully." Another also stated that she took this action seriously, noting that she had looked through the list very carefully, read several of the books, and personally researched many others. She even brought several of the books with her to the meeting. The School Board, however, did not discuss a particular book or passage from any book and did not discuss the rubric used by the library committee. The School Board ultimately voted to adopt the library committee's recommendations with a 4-1 vote.

### iii. The Complaint

FLCA brought its two-count complaint, alleging that the School Board had twice violated Florida's Sunshine Law: Count I related to the textbook adoption and Count II related to the library book review. The circuit court entered a final order: (1) granting the School Board's Motion for Summary Judgment; (2) denying FLCA's first Partial Motion for Summary Judgment; (3) denying FLCA's Motion to Amend the Case Management Plan; and (4) denying FLCA's second Partial Motion for Summary Judgment as untimely and moot.

### Analysis

FLCA challenges the circuit court's holding that neither the textbook committee nor library committee was subject to the Sunshine Law. Florida's Sunshine Law, chapter 286, Florida Statutes, provides a right of access to governmental proceedings. *Lyon v. Lake Cnty.*, 765 So. 2d 785, 789 (Fla. 5th DCA 2000). Generally, the Sunshine Law requires public entities to provide the public with reasonable notice, access, and an opportunity to be heard before taking official action. *See* § 286.011(1), Fla. Stat. (2016). The Sunshine Law also requires the creation of minutes for public meetings, promptly made available for public inspection. *See* § 286.011(2), Fla. Stat. (2016). Below, we separately address whether the two committees were subject to the Sunshine Law.

### i. The textbook committee was subject to the Sunshine Law

Not all government meetings are subject to the Sunshine Law. The School Board argues, and the circuit court agreed, that the textbook committee was one such exception. They rely on the fact that "the Sunshine Law does not apply 'when a governmental executive uses staff for a fact-finding and advisory function in fulfilling his or her duties.'" *Fla. Citizens All., Inc. v. Sch. Bd. of Collier Cnty.*, 328 So. 3d 22, 27 (Fla. 2d DCA 2021) (quoting *Knox v. Dist. Sch. Bd. of Brevard*, 821 So. 2d 311, 315 (Fla. 5th DCA 2002)). Similarly, the Sunshine Law does not apply to informal meetings of staff where the discussions were "merely informational," where none of the individuals attending the meetings had decision-making authority during the meetings, and where no formal action was taken or could have been taken at the meetings. *Lyon*, 765 So. 2d at 785.

Whether a delegation of decision-making authority or fact-finding authority has occurred, such delegation is evaluated according to the "nature of the act performed, not on the make-up of the committee or the proximity of the act to the final decision." *Wood v. Marston*, 442 So. 2d 934, 939 (Fla. 1983). A delegation of authority occurs where the committee "help[s] to crystalize the decision" made by the delegating authority. *Fla. Citizens All.*, 328 So. 3d at 27 (quoting *Silver Express Co. v. Dist. Bd. of Lower Tribunal Trs. of Miami-Dade Cmty. Coll.*, 691 So. 2d 1099, 1100 (Fla. 3d DCA 1997)). A committee has been delegated authority when it helps to crystalize the decision by presenting "structured recommendations" that "eliminate opportunities for alternative choices by the final authority, or which rank applications for the final authority . . . ." *Fla. Citizens All.*, 328 So. 3d at 27 (citing *Carlson v. State*, 227 So. 3d 1261, 1265-66 (Fla. 1st DCA 2017)).

If the committee has been delegated decision-making authority, the "collective inquiry and discussion stages" are subject to the Sunshine Law if these stages "relate[] to any matter on which foreseeable action will be taken." *Sarasota Citizens for Responsible Gov't v. City of Sarasota*, 48 So. 3d 755, 762 (Fla. 2010) (citation omitted).

In this case, the textbook committee was delegated decision-making authority. As in the analogous case which FLCA had brought in the Second District, the textbook committee was formed pursuant to School Board Policy 2520, which empowers the Superintendent to establish "Instructional Materials Review Committees," which then use quantitative rubrics to evaluate the materials. *Fla. Citizens All.*, 328 So. 3d at 25-26. The textbook committee's "evaluation and ranking of the textbooks clearly 'help[] to crystalize the decision to be made by' the School Board." *Id.* at 28 (quoting *Silver Express*, 691 So. 2d at 1100).

6

Because the textbook committee is subject to the Sunshine Law, we must apply Sunshine Law to the committee's activities. We first turn to notice, as when a meeting is subject to the Sunshine Law, the government agency must provide the public with reasonable notice. *See* § 286.011(1), Fla. Stat. (2016). This is to "apprise the public of the pendency of matters that might affect their rights, afford them the opportunity to appear and present their views, and afford them a reasonable time to make an appearance if they wish[]." *Lyon*, 765 So. 2d at 790 n.4 (Fla. 5th DCA 2000) (quoting *Rhea v. City of Gainesville*, 574 So. 2d 221, 222 (Fla. 1st DCA 1991)). The statute does not define what notice is "reasonable." *See* § 286.011(1), Fla. Stat. (2016). Whether or not reasonable notice has been provided is a fact-specific inquiry that varies from case to case. *Transparency for Fla. v. City of Port St. Lucie*, 240 So. 3d 780, 786 (Fla. 4th DCA 2018).

But the textbook committee did not provide adequate notice for each of its formal meetings. The first meeting, held on October 11, 2016, had no notice. A post about a subsequent meeting did not include the location or indicate the meeting was open to the public. And the author of the notice testified that the post was not intended to be public notice. A press release was issued for the December 16 meeting, but the press release suffers from the same deficiencies as the posts: it does not state the meeting's time, location, or that it was open to the public. Indeed, the press release insinuates that the meeting was closed to the public, considering it invites the public to "make suggestions" in the twenty days after the meeting. Finally, the School Board asserts that the Facebook and Twitter posts from December 8, which invited the public to "participate in review process," may have also functioned as notice for the December 16 meeting. Although the record does not state what information was on the other end of the posts' hyperlinks, it does not appear to have been "notice" for that meeting. The School Board's corporate representative testified that the link would have led to a "survey collection instrument," where the public could provide "feedback on the social studies adoption." These posts and press releases were insufficient to constitute notice.

The School Board also argues that the lack of record of notice does not prove that notice was not sent. In other words, the School Board argues FLCA did not prove a negative. In response, FLCA argues it did prove a negative. Section 90.803(10), Florida Statutes (2016), provides:

> **Absence of public record or entry.**--Evidence, in the form of a certification in accord with s. 90.902, or in the form of testimony, that diligent search failed to disclose a record, report, statement, or data compilation or entry, when offered

to prove the absence of the record, report, statement, or data compilation or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation would regularly have been made and preserved by a public office and agency.

To use this hearsay exception, a party must elicit testimony indicating that the absent records would have been kept and maintained, but a diligent search did not reveal them. *See Riggins v. State,* 67 So. 3d 244, 246 (Fla. 2nd DCA 2010) (holding that testimony that other records might have existed or exist is insufficient to show evidence of a diligent search under section 90.803(10)).

FLCA argues that Florida's Administrative Code requires school districts to maintain these records. *See* Fla. Admin. Code R. 1B-24.003(1)(f) (stating that documents within "General Records Schedule GS7 for Public Schools Pre-K-12 and Adult and Career Education" must be retained by the State and its agencies, and Item #99 of that Schedule is "Textbook/Instructional Material Evaluation Records," which must be retained "as long as textbook/instructional material remains formally adopted"). The School Board's records custodian testified that she made a diligent search for records demonstrating notice but did not find them. While other records may have existed, FLCA met its burden. The School Board was required to provide notice of the textbook committee meetings and failed to do so.

The School Board also failed to maintain minutes of the textbook committee meetings. Section 286.011(2) requires that minutes of a meeting of a public board or commission be "promptly recorded" and "open to public inspection." The School Board alleges that it took handwritten notes of the meetings, but the handwritten notes were neither saved nor made available to the public. Instead, the School Board alleges, the notes were incorporated into a PowerPoint presentation which was ultimately presented at the Superintendent's Workshop. But the PowerPoint presentation is sparse on details of what occurred at the meetings. The PowerPoint does not state which materials were discussed at which meeting, why certain materials were not chosen, who voted for which textbooks, what the vote counts were, or even who was present for the votes. The PowerPoint merely listed some positive attributes for the textbooks which the textbook committee had recommended. The PowerPoint was also not provided to the public until more than four months after the meetings it purportedly documented.

8

We do agree with the School Board that holding its meetings simultaneous with the textbook committee's meetings to discuss the primary and secondary aged textbooks did not violate the Sunshine Law. The School Board and its textbook committee are permitted to hold simultaneous meetings.

Finally, we reject the School Board's argument that it cured any Sunshine Law violations. We recognize that violations of the Sunshine Law "can be cured by 'independent, final action in the sunshine.'" *Sarasota Citizens for Responsible Gov't v. City of Sarasota*, 48 So. 3d 755, 765 (Fla. 2010) (quoting *Tolar v. Sch. Bd. of Liberty Cnty.*, 398 So. 2d 427, 429 (Fla. 1981)). This is distinguished from "mere ceremonial acceptance or perfunctory ratification of secret actions and decisions." *Id.*; *see also Zorc v. City of Vero Beach*, 722 So. 2d 891, 902 (Fla. 4th DCA 1998) ("[O]nly a *full*, open hearing will cure a defect arising from a Sunshine Law violation. Such violation will not be cured by a perfunctory ratification of the action taken outside of the sunshine.").

Although the February 28 and April 25 meetings were properly noticed, the public had an opportunity to ask questions, and the School Board members dutifully discussed the recommended materials at those meetings, this still was not a "full, open hearing" required to cure Sunshine violations. *See Zorc*, 722 So. 2d at 902. The School Board did not truly relitigate the findings of the textbook committee. The School Board discussed the textbooks for thirteen minutes at the February 28 meeting and for three minutes at the April 25 meeting before adopting the textbook committee's recommendations. The School Board spent no time discussing textbooks which were not recommended by the Committee. Nor did the School Board discuss or examine the textbook committee's decision-making process. The School Board's cursory examination of the issue was not a full reexamination of the issue. *Fla. Citizens All.*, 328 So. 3d at 29.

In summary, the textbook committee was subject to the Sunshine Law and violated the Sunshine Law by failing to notice its meetings or keep minutes at the meetings.

### ii.    The library committee was not subject to the Sunshine Law

The same analysis applies to the library committee. FLCA argues that the library committee "made hundreds of decisions" when it reviewed the challenged books in Indian River County school libraries because the library committee reviewed each book to determine 1) whether it violated

9

pornography laws, 2) whether the book had literary merit, and 3) what age level of students should be able to access the book.

We disagree. A key factor distinguishing the library committee's "recommendations" from the textbook committee's "recommendations" is that the library committee did not winnow down the number of books before sending its recommendations to the School Board for review. Every challenged book reviewed by the library committee was submitted to the School Board for the School Board's final decision. The textbook committee, by contrast, submitted only its recommended textbooks to the School Board for its review and approval; the unrecommended textbooks were not presented. This demonstrates that no aspect of the decision-making authority was delegated to the library committee—the School Board retained all authority. The record suggests the School Board exercised that authority too, with members reading individual books and researching others.

As a result, the library committee was not given decision-making authority and was not subject to the Sunshine Law.

## Conclusion

In summary, the School Board's textbook committee was subject to Florida's Sunshine Law, and violated the Sunshine Law by failing to notice its meetings or keep minutes at the meetings. But the library committee was not subject to the Sunshine Law. As a result, we affirm the circuit court's judgment in part, reverse in part, and remand for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

GERBER and CONNER, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

10